# COMANCHE COUNTY *v.* LEWIS.

ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE DISTRICT OF KANSAS.

No. 1022. Submitted January 7, 1890. — Decided January 27, 1890.

Full control over the matter of the organization of new counties in the State of Kansas is; by its constitution, article 9, § 1, given to the legislature of the State, which has power, not only to organize a county in any manner it sees fit, but also to validate by recognition any organization already existing, no matter how fraudulent the proceedings therefor were.

When a legislature has full power to create corporations, its act recognizing as valid a *de facto* corporation, whether private or municipal, operates to cure all defects in steps leading up to an organization, and makes a *de jure* out of what was before only a *de facto* corporation.

When both the executive and legislative departments of the State have given notice to the world that a county within the territorial limits of the State of Kansas has been duly organized, and exists, with full power of contracting, it is not open to the county to dispute those facts in an action brought against it by a holder of its bonds, who bought them in good faith in open market.

The debts of a county, contracted during a valid organization, remain the obligations of the county, although, for a time, the organization be abandoned, and there are no officers. to be reached by the process of the court.

A recital in the bond of a municipal corporation in Kansas that it was issued in accordance with authority conferred by the act of March 2, 1872, Kansas Laws of 1872, 110, c. 68, and in accordance with a vote of a majority of the qualified voters, is sufficient to validate the bonds in the hands of a *bona fide* holder; and the certificate of the auditor of the State thereon that the bond was regularly issued, that the signatures were genuine, and that the bond had been duly registered, is conclusive upon the municipality.

A recital in a bond issued by a county in Kansas for the purpose of building a bridge, need not necessarily refer to the particular bridge for the construction of which it was issued.

In Kansas a county has power to borrow money for the erection of county buildings, and to issue its bonds therefor.

AT LAW, to recover on coupons of bonds issued by a municipal corporation in Kansas. Judgment for plaintiff. Defendant sued out this writ of error. The case is stated in the opinion.

*Mr. G. C. Clemens* and *Mr. A. H. Smith* for plaintiff in error.

*Mr. W. H. Rossington* for defendant in error.

MR. JUSTICE BREWER delivered the opinion of the court.

This is an action on coupons. There were three classes of bonds, namely, court-house, bridge and current expense bonds. The Circuit Court held the latter void, the others valid, and judgment was rendered accordingly  *Lewis* v. *Comanche County,* 35 Fed. Rep. 343. The county alleges error. Our inquiry, therefore, is limited to the bridge and court-house bonds.

The first and principal contention of the plaintiff in error is that at the time of the issue of these bonds there was no valid county organization, no corporate entity capable of contracting, that the pretended organization in 1873 was fraudulent and void, and shortly thereafter abandoned, the county remaining unorganized until 1885, when, upon memorial presented and census taken, it was organized anew as in the case of an unorganized county.

In order to fully understand the question here presented, a brief retrospect of the condition, the legislation and judicial decisions of the State is necessary.

At the time of its admission into the Union, in 1861, the settlements were confined to the eastern portion of the State, the west being wholly unoccupied. The territory of the State was divided into counties, those in the eastern portion being organized, and those in the western unorganized, the legislation as to the latter being limited to the matter of names and boundaries. Of course there were no courts in these unorganized counties, for the machinery was wanting; there were no county buildings, county officers or jurors. So they were by statute attached to the organized counties for judicial purposes. It was foreseen that they would, in course of time, become occupied, and that provision must be made for their organization as political subdivisions of the State. So, by the constitu

tion, in section 1 of article 9, power was given to the legislature in these words: "The legislature shall provide for organizing new counties, locating county-seats, and changing county lines."

The first legislature, on the fourth day of June, 1861, passed an act entitled, "An act relating to the organization of new counties." This was amended in 1872, and under the act as so amended the county of Comanche was organized. Section 1 of this chapter prescribes the proceedings, and is as follows:

"Section 1. Section 1 of an act relating to the organization of new counties is hereby amended so as to read; Section 1. When there shall be presented to the governor a memorial, signed by forty householders who are legal electors of the State, of any unorganized county, showing that there are six hundred inhabitants in such county, and praying that such county may be organized, accompanied by an affidavit attached to such memorial, of at least three householders of such county; showing that the signatures to such memorial are the genuine signatures of householders of such unorganized county, and that the affiants have reason to and do believe that there are six hundred inhabitants in such county as stated in the memorial, it shall be the duty of the governor to appoint some competent person, who is a *bona fide* resident of the county, to take the census and ascertain the number of *bona fide* inhabitants of such unorganized county, who shall, after being duly sworn to faithfully discharge the duties of his office, proceed to take the census of such county, by ascertaining the name and age of each of the *bona fide* inhabitants of such unorganized county, who shall receive for services rendered under this section pay at the rate of three dollars per day, from the state treasurer, upon an itemized account, verified by affidavit. The person who shall take the census as required, shall return to the governor, upon appropriate schedules, the census authorized to be taken herein, certified to be correct and true, and if it appear by such return that there are in such unorganized county at least six hundred *bona fide* inhabitants, he shall appoint three persons, who shall be recommended in the memorial hereinbefore provided for, to act as county commissioners, and a proper person to act as county clerk, to be recommended in

like manner as the commissioners, and shall designate such place as he may select, centrally located, as a temporary county-seat for such county, and shall commission such persons as such officers, and declare such place the temporary county-seat of such county; and from and after qualification of the officers appointed under this section, the said county seat shall be deemed duly organized." Laws of Kansas of 1872, p. 243.

Obviously, full control over the matter of organization of new counties was, by the constitutional provision quoted, given to the legislature, as was held by the Supreme Court of the State in the case of the *State ex rel. Attorney General* v. *Commissioners of Pawnee County*, 12 Kansas, 426, 438, in which case the court says:

"The whole power of organizing new counties belongs in this State to the legislature. It may provide for their organization by general laws and through the intervention of the governor, or of any other officer, agent, commissioner or person it may choose; or it may directly organize a new county itself by special act. The provision of article 12 of the constitution has no application to counties as counties. *Beach* v. *Leahy*, 11 Kansas, 23. It may organize a county with six hundred inhabitants, or with any number more or less than six hundred. It may organize a county whenever there shall be a sufficient number of persons to hold the county offices, and the legislature may provide for a less number of county officers than the usual number. *Borton* v. *Buck*, 8 Kansas, 308; *Leavenworth* v. *State*, 5 Kansas, 688."

In the fall of 1873 proceedings looking to the organization of Comanche County were had, which were in form in full compliance with the requirements of section 1, above quoted. These proceedings closed, as required, with the proclamation of the governor, and upon the face of the papers was presented a clear case of a regular and valid organization. But while these proceedings were regular on their face, the agreed statement of facts shows that "said organization was effected solely for purposes of plunder by a set of men intending to secure a *de facto* organization and issue the bonds of said county, register and sell them to distant purchasers ignorant

of the facts, and enrich the schemers, while plundering the future inhabitants and taxpayers of the county; and upon the consummation of said scheme, in the spring or early summer of 1874, all of said schemers, together with those who were the said *de facto* officers of the said county, left said county and never returned, and said county remained with said organization totally abandoned until, in February, 1885, when said county was, upon memorial presented and census taken, organized as in cases of unorganized counties."

If these were all the facts, a very interesting inquiry would arise as to how far an organization fraudulent in fact but regular in form, and duly approved by the executive, could bind the county by an issue of bonds *prima facie* valid, and passing into the hands of a *bona fide* holder. But that inquiry is not before us. The ample power delegated by the constitution to the legislature enabled it not only to organize a county in any manner it saw fit, but also to validate by recognition any organization already existing, no matter how fraudulent the proceedings therefor had been.

This proposition has been distinctly ruled by the Supreme Court of the State. See the case in 12 Kansas, *supra;* see also *State ex rel. Atty. Gen.* v. *Stevens* (Harper County), 21 Kansas, 210; and *State ex rel. Atty. Gen.* v. *Hamilton; Same* v. *Foxall* (Wallace County), 40 Kansas, 323.

Nor is this ruling peculiar to the jurisdiction of Kansas. It is universally affirmed that when a legislature has full power to create corporations, its act recognizing as valid a *de facto* corporation whether private or municipal, operates to cure all defects in steps leading up to the organization and makes a *de jure* out of what before was only a *de facto* corporation. It is true that there must be a *de facto* organization upon which this recognition may act, as was held in *State ex rel. Atty. Gen.* v. *Ford County*, 12 Kansas, 441, 446; and in this case it appears from the findings, as well as from the testimony, that there was such *de facto* organization. There being this *de facto* organization, there was ample recognition by the legislature. The very matter appears which, in the Harper County case, was, by the Supreme Court of Kansas, declared a legislative

recognition sufficient to cure all defects, namely, an act detaching the county from an organized county to which, for judicial purposes, it had theretofore been attached, and establishing courts therein. This act was approved March 9, 1874, the day before these bonds were signed. But this, which, by the Supreme Court of Kansas, was adjudged alone sufficient, is not all. Chapter 24 of the General Statutes of 1868, creating some new counties, divided the State into seventy-nine counties, numbered, named and described, among which was the unorganized county of Comanche ; and provided that no county should be entitled to representation in the legislature until it should have been organized. During the session of 1874, the session immediately succeeding this attempted organization, and before the issue of these bonds, A. J. Mowry represented Comanche County in the legislature, taking active part in its proceedings, voting for senator, introducing bills and otherwise. His right to a seat was challenged, examined by the committee on elections, and, after report therefrom, he was admitted and acted as a member during the entire session. Further than that, this organization having become a matter of discussion and challenge, the legislature passed a joint resolution, which recited that it appears from the report of the secretary of State that there were but 634 inhabitants in the county of Comanche, and from the report of the auditor of the State that the bonded indebtedness of the county was $72,000 ; that the interests of the people and the honor of the State required an investigation ; and directed that a committee of two should be appointed, one from each house, who, together with the attorney general, should make an investigation and report to the succeeding legislature. By that report, in January, 1875, the character of the organization was disclosed, and from that time on the county was, as stated, treated as an unorganized county until 1885. It also appears that in December, 1873, not only was a member of the legislature elected, but, in addition, a new commissioner and a new county clerk, in the places of those temporarily appointed by the governor. There thus appears ample recognition, on the part of the legislature, of the validity of the organization, and;

under repeated adjudications, its validity cannot now in this collateral way be challenged. And this is no mere technical ruling. It rests on foundations of substantial justice. It is true that the present inhabitants have been wronged by the fraudulent acts of these conspirators in 1873–74, and it is a hardship for them to be bound for debts they did not contract and from which they received no benefit; but, on the other hand, it would be an equal hardship to the plaintiff to lose the money he has invested in securities placed on the market, whose validity was attested to the fullest extent by both the executive and legislative departments of the State. When both of those departments give notice to the world that a county within the territorial limits of the State has been duly organized and exists with full power of contracting, can it be that a purchaser cannot in open market safely purchase the securities of that county? Does the duty rest on him to traverse the limits of the county and make personal inspection of the number of the inhabitants? If any wrong has been done to the county through the want of attention on the part of the state authorities, equity would suggest that the State should bear the burden, and not cast it upon an innocent party residing far from the State and acting in reliance upon what it has done.

But it is urged that whatever may be said as to the organization in 1873–74, and its temporary validity, that organization was in 1874 abandoned, the county deserted, and a new organization made in 1885, and, it being a new organization there is no responsibility on its part for debts fraudulently contracted more than a decade before, by a confessedly fraudulent organization. Why should honest and industrious citizens, who have recently moved into hitherto unoccupied territory, be held responsible for debts fraudulently contracted years before by a set of rascals who stopped but for a day, and then decamped with the proceeds of their rascality? But it must be borne in mind that the county, as a territorial subdivision of the State, has been in existence and unchallenged for more than a score of years. It matters not how many political organizations there may have been, or what changes in the form of

organization, the county has been ever the same, and, although the name of the political community given by the statutes is the "board of county commissioners" of the county, it is, after all, the county, with its property and population, which is the debtor. No one would for a moment suppose that when a county has contracted a valid obligation, the fact, if it could be made to appear, that all its inhabitants had removed and their places been supplied by others, would affect that obligation. There has been no subdivision of the original territory; no addition to or subtraction from it. The only change has been in the continuity of political organization, and that, neither by municipal law nor the law of nations, destroys the territorial responsibility for legal obligations. Even a change in form does not destroy responsibility. The republic of France recognizes as valid the debts of the empire. A town whose growth enables it to cast off its village organization and assume the habiliments of a city continues liable for all debts theretofore contracted. And so the debts of a county, contracted during a valid organization, remain the obligations of the county, although for a time the organization be abandoned and there be no officers to be reached by the process of the courts. *State ex rel.* v. *Yoxall,* 40 Kansas, 323; *The Sapphire,* 11 Wall. 164; *Broughton* v. *Pensacola,* 93 U. S. 266; *Mount Pleasant* v. *Beckwith,* 100 U. S. 514.

Passing to the question of the bonds themselves, the first to be considered are the bridge bonds. The recital is in these words:

"This bond is executed and issued in pursuance of and in accordance with an act of the legislature of the State of Kansas, entitled 'An act to authorize counties, incorporated cities, and municipal townships to issue bonds for the purpose of building bridges, aiding in the construction of railroads, water-power or other works of internal improvement, and providing for the registration of such bonds, the registration of other bonds, and the repealing of all laws in conflict therewith,' approved March 2, 1872, and also in accordance with the vote of a majority of the qualified electors of said county of Comanche, at a special election duly and regularly held therefor on the 31st day of January, 1884 [1874]."

The act referred to therein gave to counties full power to issue bonds for the building of bridges and prescribed the proceedings, including therein a vote of the people, essential to the vesting of authority in the county commissioners. The recital that the bond was executed and issued in pursuance of and in accordance with that act, and also in accordance with the vote of the majority of the qualified electors, is, within repeated rulings of this court, sufficient to validate the bonds in the hands of a *bona fide* holder. It shows, in the language of *School District v. Stone*, 106 U. S. 183, "a compliance in all substantial respects with the statute giving authority to issue the bonds," and does not come within the limitations noticed in that case. Further than that, the bonds are endorsed with the official certificate of the auditor of the State that the bonds had been regularly and legally issued; that the signatures were genuine; and that the bonds had been duly registered in his office in accordance with the act of the legislature of March 2, 1872. Inasmuch as these bonds were issued after the act of 1872 went into effect, they fall within the decision in the case of *Lewis v. Commissioners*, 105 U. S. 739, rather than within that in the case of *Bissell v. Spring Valley Township*, 110 U. S. 162, as to the conclusiveness of the certificate of the auditor.

The suggestion that the recitals are not sufficient because the particular bridge, for the building of which the bonds were to be issued, is not specified, carries no weight. Power is given by the first section of the act of 1872 to issue bonds for building bridges, and while the subsequent sections providing for a vote and other preliminaries seem to contemplate that a particular bridge should be the subject of consideration, yet it has never been held by this court, and ought not to be, that a full and minute detail of all the proceedings is essential to the validity of a recital. The main thing is that the county has promised to pay, and that the people by their vote have authorized such a promise for one of the purposes for which, under the statute, they may bind themselves.

The other series of bonds is what is known as "court-house bonds," so named on the face of the bonds themselves. The

recital in this bond is as follows: "This bond is executed and issued for the purpose of erecting county buildings in pursuance of and in accordance with an act of the legislature of the State of Kansas, entitled, 'An act relating to counties and county officers,' approved February 29, 1868, and 'An act to authorize counties,'" etc., reciting the title of the act referred to in the bridge bonds, as well as a vote similar thereto. On the back of each bond appears the auditor's certificate as in the bridge bonds.

But it is insisted that county buildings are not works of internal improvement within the meaning of the act last referred to. Be that as it may — and it is unnecessary to decide this question, although in considering it reference may well be had to the opinion of the Supreme Court of Kansas in the case of *Leavenworth County* v. *Miller,* 7 Kansas, 479 — the act first referred to, the act of February 29, 1868, gave ample authority. That act, section 16, provides : " The board of county commissioners of each county shall have power, at any meeting: . . . *Fourth,* . . . *to borrow,* upon the credit of the county, *a sum* sufficient for the erection of county buildings, or to meet the current expenses of the county in case of a deficit in the county revenue."

Prior to the issue of these bonds the Supreme Court of the State had held, in the case of *Doty* v. *Ellsbree,* 11 Kansas, 209, that the power to borrow money carries with it the power to issue the ordinary evidences and security of a loan, and, among them, county bonds. So that, by that act, the county had power to borrow money for the erection of county buildings and issue bonds therefor. There is no force in the suggestion that the purpose expressed in the recital is that of erecting county buildings, instead of borrowing money for the erection of county buildings. A general statement of the purpose, with direct reference to the act granting authority, and a recital that the bond is issued in pursuance of and in accordance with the act, is sufficient. The case of *Scipio* v. *Wright,* 101 U. S. 665, rested entirely on the fact of the uniform and continuous ruling on the part of the highest court in the State of New York, in which the bonds were issued, and was a case aris-

ing between a municipality and a purchaser who took with notice of the manner in which the bonds had been disposed of. So that this cannot be considered an authority in the case before us.

These are all the matters we deem necessary to notice, and, there appearing no error in the ruling of the Circuit Court, its judgment is

*Affirmed.*