## STATE EX REL. BUDGE v. SNYDER

(No. 1179, May 20th, 1924; 225 Pac. 1102.)

STATUTES — CURATIVE ACTS — CONSTITUTIONAL LAW — RETROACTIVE LEGISLATION — EVIDENCE — JUDICIAL KNOWLEDGE — COUNTIES — ORGANIZATION OF COUNTIES.

1. A curative act, being necessarily retroactive and applicable. only to conditions then existing, is not a special law in the constitutional sense, but may be regarded as a general law, if otherwise entitled to be so considered, though special in form.

2. Whether a law be general or special depends on its subject-matter, not its form.

3. A validating act need not be of same kind or nature as that required for original authority, where thing lacking might have been dispensed with by Legislature.

4. Legislature has all legislative authority, except as restricted, expressly or by clear implication, by state. or federal Constitution, which do not prohibit retroactive legislation not destroying obligation of contracts or interfering with vested rights.

5. Supreme Court judicially knows that Teton county is surrounded on all sides by mountain ranges and is without railroad communication with county seat of parent county of Lincoln, except by wagon road over mountain pass about 28 miles to railroad station in Idaho more than 100 miles from such county seat.

6. Organization of Teton county under Laws 1921, c. 53, without regard to provisions of Comp. St. 1920, § 1281, as to population and assessed valuation of property, having been validated by curative act of 1923, and recognized by Laws 1923, c. 27, and Laws 1923, c. 77, and a term of court held therein, its organization will be invalidated only on the strongest kind of showing.

7. Organization of Teton county under Laws 1921, c. 53, out of territory in Lincoln county, *held* not invalid because larger county tax was subsequently levied than that levied in same year by parent county; nor would such rate, if within constitutional or statutory maximum, amount to taking of property without due process.

On petition for rehearing.  For original opinion, see
30 Wyo. 294, 219 Pac. 735.

*Haggard & O'Mahoney*, for Plaintiff.

*David J. Howell*, Attorney General, *W. C. Mentzer* and
*P. W. Spaulding*, for Respondent.

Potter, Chief Justice.

The relators have filed a petition for rehearing.  They,
as taxpayers residing within the territory of what had be-
come known as Teton County, challenged the validity of
the organization of that county; and the decision was ad--
verse to their claims, the court holding that, notwithstand-
ing certain legal defects in the organization of the county,
it had been validated by a statute enacted for that pur-
pose.

As thus indicated, the question chiefly considered upon
the original hearing was the effect of a legislative act
ratifying the organization proceedings and declaring the
county to be a duly created, formed, established and or-
ganized county of the State.  The validity thereof was
challenged on the ground, generally, that the organization
proceedings were without authority of law because of the
lack of necessary population and assessable property val-
uation required by the general law as a condition to the
organization of new counties.  And the petition for rehear-
ing, with two exceptions, again presents that question by
stating as grounds:

That the court erred: 1.  In holding that the alleged
curative act attempted to do nothing that might not have
been done in advance.  2.  In holding that said Act is not
special and local and as such prohibited by the State Con-
stitution.  3.  In holding that a general law could not be
made applicable.  4.  Declining to hold that until the gen-
eral law for organizing counties is amended, no single
county may be organized directly or indirectly, by special
or curative act unless it meets all the requirements of the

general law.   5.   In failing to consider the prohibitive
effect upon the validating act of the constitutional provi-
sion that all laws of a general nature shall have uniform
operation.

The general trend of the present argument on behalf of
the relators is that the curative act is not a general law,
but special, and an attempt to do indirectly what the leg-
islature could not have done directly, viz: organize the
county by a special act.   It is thus contended that the leg-
islature being required by the Constitution to provide for
the organization of counties by general law, the alleged
and conceded defect in the organization proceedings can-
not be cured except by a general law.   The fundamental
error in this argument, in our opinion, is the assumed pro-
position that the curative act in question is to be classified
or considered as a legislative act *organizing* the county.
That embraces a misstatement of the purpose and effect of
the legislation, and ignores the situation confronting the
legislature when the act was passed, to meet which it was
enacted,—a de facto county organization, claiming a valid
organization under the Act of 1921 creating and forming
the county and the general law for the organization of
counties.   See Budge v. Commissioners, 29 Wyo. 35, 208
Pac. 874.   And our discussion at this time will be devoted
principally to that phase of the question.

But, first, we want to say, as suggested in the former
opinion, that the act might properly be considered as a
general law, though special in form, since the conditions
to be remedied existed in only one case, and, if general in
form, the act could have had no other or greater opera-
tion.   A curative act is necessarily retroactive, and, though
general in form as such an act may be and often is, it can
apply only to a condition or conditions then existing, and,
therefore, may not come within a definition of a general
law occasionally found in the books requiring that its
classification be not limited to existing conditions or lo-
calities or persons within the class when the act is passed.

Yet we think it correct to say that a curative act is not usually held to be special for that reason alone; but its peculiar purpose is recognized as taking it out of such a definition, allowing it to be regarded as a general law if otherwise entitled to be so considered, or, as declared in our former opinion as to the act in question, not a special law in the constitutional sense. See Cole v. Dorr, 80 Kan. 251, 101 Pac. 1016; 22 L. R. A. (N. S.) 534; Flynn v. Little Falls Etc. Co., 74 Minn. 180; 77 N. W. 38, 78 N. W. 106; State ex rel v. Brown, 97 Minn. 402, 106 N. W. 477, 5 L. R. A. (N. S.) 327; City of Pullman v. Hungate, 8 Wash. 519, 36 Pac. 483; Redlands v. Brook, 151 Cal. 474, 91 Pac. 150. Whether a law be general or special does not depend upon its form, but upon its subject matter. State v. Ellet, 47 O. St. 90, 23 N. E. 931, 21 Am. St. 772; State v. Cooley, 56 Minn. 540; 58 N. W. 150. It is said in Lewis' Sutherland Stat. Constr. at section 200:

"That the question is not one of form is expressly held as necessarily implied in all of the cases, * * *. But while in most of the adjudicated cases the laws under consideration were general in form, but were assailed as special in fact, yet in some cases laws special in form have been held to be general in fact, and the test is the same in both cases. The question must be determined from the act itself and from facts of which the court will take judicial notice."

Upon a fairly exhaustive re-examination of the question suggested by the argument aforesaid, we remain convinced that upon the conditions presented by the facts in this case, the act in question, whether to be classed technically as general or special, must be upheld as a valid exercise of the legislative power, upon the principle, which we think settled by eminent and ample, if not the clear weight of authority, that where the thing lacking causing the defect might have been dispensed with by the legisla-

ture, it is not necessary that the subsequent validating act shall be the same kind or nature as that required for the original authority, as was clearly held in State v. Squires, 26 Ia. 340. That case is cited and quoted from in the former opinion, and has been approvingly cited in many cases involving the validity of a curative statute, and is the leading case upon the point just stated.

The same principle was declared by the Supreme Court of the United States in Read v. Plattsmouth, 107 U. S. 568, 2 Sup. Ct. 208, 27 L. ed. 414, also cited in the former opinion, and often cited with State v. Squires upon this question. And we believe it remains unchanged as authority by any later expression of that eminent court, but rather fortified as such by subsequent decisions. See Comanche Co. v. Lewis, 133 U. S. 198; 10 Sup. Ct. 286, 33 L. ed. 604; Harper Co. v. Rose, 140 U. S. 71; 11 Sup. Ct. 710, 35 L. ed. 344; Sherman Co. v. Simons, 109 U. S. 735; 3 Sup. Ct. 502, 27 L. ed. 1093; Utter v. Franklin, 172 U. S. 416, 424, 19 Sup. Ct. 183, 43 L. ed. 498. The curative act in that case had confirmed and legalized "all acts and proceedings of the city council of the city of Plattsmouth" in relation to the issuing of bonds and letting a contract for the construction of a high-school building. Its validity was assailed on the ground that legalizing bonds, void because issued without power, was equivalent to conferring corporate power to issue them, and, being a special act, was therefore unconstitutional. The court said:

"But this conclusion we cannot adopt. The act in question, so far as it relates to the bonds in suit, does not confer any corporate power upon the city in the sense of the Constitution of the State. The statute operates upon the transaction itself, which had already previously been consummated, and seeks to give it a character and effect different in its legal aspect from that which it had when it was *in fieri*. Whether such an effect may be given by a legitimate exercise of legislative power, depends upon

those considerations which draw the line beyond which
retroactive laws cannot pass, *and is not affected by the
supposed form of the enactment as a special or general act*
conferring corporate power (italics ours). For it oper-
ates upon the rights of the parties, as determined by the
equity of their circumstances and relations, and gives to
them the sanction derived from subsequent confirmation,
by clothing them with forms which are essential to their
enforcement, but not to their existence. Within the usual
limitations prescribed by our written constitutions, such
as have been quoted from that of Nebraska, this may be
done, provided it can be done without the destruction of
rights recognized by the law as vested.''

And, in the further course of the opinion the court re-
ferred to State v. Squires as follows:

''So it was held in The State v. Squire, 26 Iowa 340,
that while the legislature would not, in view of the consti-
tutional provision of that State, have the power to pass a
special law incorporating an independent school district,
it would nevertheless have the power to pass a curative
act, legalizing the defective organization of a school dis-
trict already in existence under the general law author-
izing the creation of independent school districts.''

In a case decided in 1898 by the United States Circuit
Court of Appeals, 8th Circuit, Springfield Safe Deposit
and Trust Co. v. City of Attica, 85 Fed. 387, 29 C. C. A.
214, the same question being involved, Read v. Platts-
mouth was recognized and followed, and it was said to
completely answer and to overcome the argument that a
statute validating a defective or illegal exercise of power
by a municipal corporation violates a constitutional provi-
sion against the enactment of special laws. And the deci-
sion was interpreted as holding that the constitutional
inhibition referred to grants of power to be exercised in

the future, and that a consideration of the evils intended
to be remedied by such a constitutional prohibition should
restrict it to grants of that character *so as not to include
within its terms curative statutes which operate upon tran-
sactions already passed and consummated.*

Read v. Plattsmouth was followed also in Jarecki Mfg.
Co. v. City of Toledo, (C. C.) 53 Fed. 329, and on page 331
of the cited volume may be found quoted a part of the
opinion in Read v. Plattsmouth quoted above, to the effect
that the curative statute operates upon the transaction
itself which had already been consummated, and therefore
does not confer additional corporate power in violation of
a provision of the constitution forbidding special legisla-
tion for that purpose.  The statute in the case now cited
was general in form, but stating conditions that made
clear its. application to the city of Toledo, purported to
validate, by declaring the same binding upon both parties,
a contract and claims thereunder entered into by the city
in excess of the power and authority theretofore granted.
The court, after stating that it was contended on behalf
of the city that the legislature had no power to legalize
debts which were incurred when the city was without
constitutional power to create the indebtedness, said fur-
ther:

"The proposition, as stated, is not the real one under
consideration.  It is better expressed by Mr. Justice
Matthews in his usual lucid and forcible style, in his opin-
ion in the case of Read v. City of Plattsmouth, 107 U. S.
568, 2 Sup. Ct. Rep. 208, where he says," etc.

And then, following the quotation from Read v. Platts-
mouth, the court further said:

"Apply the principle here announced to the cases under
consideration.  The act in question, so far as the accounts
sued upon are concerned does not confer upon the city of

Toledo any corporate power in the sense of the constitution. These transactions had already been consummated.''

The same question was considered and the same view expressed in Texas. State ex rel v. Larkin, 41 Tex. Civ. App. 253, 90 S. W. 912. The case was quo warranto to test, as we understand, the validity of the organization of a municipal corporation. From the opinion in the case we quote the following:

''But appellant contends that the Constitution provides in substance that the Legislature shall not pass any local or special law incorporating cities, towns, or villages, or changing their charters, and it is insisted that validating the corporation of the city of Athens is 'authorizing the incorporation of said city.' We cannot agree with this contention. We are of the opinion that the Legislature could by special act validate defects made in an honest attempt to incorporate under the General Laws. While the Legislature could not, under the Constitution, by special act create a municipal corporation having a population of 10,000 inhabitants or less, nevertheless, it had the power by special act to pass a curative act legalizing the defective incorporation of a city already in existence under the General Laws. (Citing cases including Nolan Co. v. State, 83 Tex. 200, 17 S. W. 823, and Read v. Plattsmouth, 107 U. S. 568). We conclude that the special act under consideration is valid. As above stated in our opinion the city of Athens is a valid municipal corporation, and that it is so, independent of the special act of the Twenty-Seventh Legislature. But, should we be mistaken in this, then we conclude that the effect of the special act was to validate any supposed defects in the corporation, resulting from irregularities in petitioning to determine if an election should be held to incorporate under the General Law, or in ordering or holding of same or in declaring the result thereof, *and also in including territory*

*of four square miles within the corporate limits.''*  (Italics
ours.)

A much later case in Iowa than State v. Squires, declar-
ing and applying the same rule, is cited in the former
opinion. McSurely v. McGrew, 140 Ia. 163, 118 N. W. 415,
132 Am. St. Rep. 248. But counsel for relators in their
present brief refer to the case as stating a different princi-
ple and seem to think that it supports their contention
here; they quote from the opinion in the case the follow-
ing:

"It is true that, generally speaking, laws must be uni-
form, and be general and not special in character; but
they are not required by the Constitution to be general,
except where a general law can be made applicable. It
must also be conceded that a Legislature can not do indi-
rectly what it has no power to do directly."

That, counsel say, states "the law concise, clear and
unmistakable," quoting from the brief. But the part of
the opinion quoted by counsel is only a part of what the
court said in the same connection upon the question; and
the quoted part bears evidence on its face that it is pre-
ceded and followed by other statements, for it does not
begin nor complete the discussion. What the court said is
this (italics being ours) :

"It is argued that the Legislature could not have dele-
gated to the board of supervisors the power to do the acts
and pass the resolutions it did, for the reason that such an
act would have been special, and not general, * * *. In
other words, it is contended that a law could not have been
passed in advance authorizing the board of supervisors of
Van Buren County *alone* to release the defendant McGrew
and the sureties on his bond. *This argument is specious,
to say the least, but we do not regard it sound.* It is true
that, generally speaking, laws must be uniform, and be

general and not special in character; but they are not required by the Constitution to be general, except where a general law can be made applicable. It must also be conceded that a Legislature can not do indirectly what it has no power to do directly. *But the question here is not the form of the original act, but rather the power to do the thing which it attempted to cure by appropriate legislation.* State v. Squires, 26 Iowa, 340; Iowa Co. v. Soper, 39 Iowa, 112. The substance and effect of the act in question was the release of the county treasurer from liability on his official bond. Did the Legislature have that power, and if it did, could it have delegated that power to the board of supervisors?''

The syllabus in the official report of the case also states that the Legislature may release a *particular county treasurer* from liability on his bond for loss of public funds, and *the act will not be unconstitutional as special legislation.* We think it clear therefore that the case is well cited in the former opinion. It squarely confirms our view of the question under consideration, and is strictly in line with State v. Squires, which it cites, and Read v. Plattsmouth, supra, on the point that the power to pass a curative act is not affected by its supposed character as a special or general law; and it is properly to be classed with other cases cited and to be cited holding that the validity of such an act is not to be determined upon the theory that it confers original authority. It is evident that, while conceding that the legislature may not do indirectly what it can not do directly, the court was of the opinion that what the legislature had done did not violate that principle.

And, without conceding or denying that principle, it is our opinion that it is a mistake to apply it, and liable to be misleading when attempted to be applied, indiscriminately, as controlling a determination of the validity of a curative act. For there are other rules not necessarily

inconsistent with it, equally well established and more truly applicable in such an inquiry, at least under conditions like those shown in this case. Whether the act in question here is to be considered as a general or special law, the legislature has not attempted thereby to accomplish indirectly what it might not do directly. It is not a law for the organization of counties nor intended as a compliance with the constitutional provision that the legislature shall provide by general law for the organization of counties. And therefore it is not controlled or affected by that provision. Nor is the act affected by any other prohibitive provision of the Constitution; for it accomplishes nothing, so far as the organization of the county is concerned, within any prohibition as to special legislation, unless it be the provision to the effect that no special law shall be enacted where a general law can be made applicable, a point sufficiently considered in the former opinion, if the provision should be held applicable at all to a curative statute necessarily limited in its operation. The legislature in this state possesses all legislative authority except as restricted by the state or federal Constitution, either expressly or by clear implication. State v. Snyder, 29 Wyo. 199, 212 Pac. 771. And the Constitution contains no provision against retroactive legislation as such, though by such legislation the legislature may not destroy the obligation of contracts, or interfere with vested rights. Like curative acts generally, the act here does not confer or pretend to confer original authority. The legislature found a de facto county organization in existence, under a claim that it had been legally organized under laws enacted for that purpose, and it acted upon that situation, and that alone. Therefore, it is incorrect to say that the legislature has done indirectly what it might not do directly. It might have omitted from the said general law the provisions ignored by the organization proceedings; and hence have thereby authorized what was

in fact done. What was accomplished was the result of direct, not indirect, action on the part of the legislature, to cure a situation existing in one locality only, by reason of a defective proceeding under the general law. And, necessarily, the legislation for that purpose was different in form and nature from legislation granting original authority, since the latter would operate prospectively only and the former retroactively and upon conditions in existence at the time. 25 R. C. L. 823.

In a comparatively recent case in Pennsylvania, (Swartz v. Carlisle Borough, 237 Pa. St. 473, 85 Atl. 487, Ann. Cas. 1914 B. 458), three dissenting justices stated as one of the grounds for their dissent that the legislature, in the act prescribing the requirements which had not been complied with, could not have excepted from its terms Carlisle Borough, that the curative act was but an attempt to accomplish indirectly through subsequent legislation something that was forbidden the legislature that passed the original enactment, and was, therefore, special legislation upon the subject required by constitutional provision to be regulated only by uniform law. That, as will be observed, is substantially the argument made here. But the majority of the Pennsylvania court held otherwise, and declared that the curative act must be sustained as a "valid exercise of legislative power," citing Read v. Plattsmouth, supra, and the Minnesota case of State v. Brown, cited above and in our former opinion.

In a later case in the same state, (Kennedy v. Meyer, 259 Pa. St. 306, 103 Atl. 44), it appeared that but one county had availed itself of a certain statute authorizing and providing the procedure for certain stated public improvements, and that after said county had so acted and become indebted to a contractor in a large amount, and the statute had been held unconstitutional because of a defective title, an act was passed validating the contract to the extent of work done before the statute was held in-

valid, and authorizing the payment of the indebtedness therefor; said act being general in form but concededly applying to the one county alone. Said curative act was held applicable by its terms to all counties in the state and therefore presumptively a general law, and the court said that the fact that but one county happened to be affected by its provisions was of no moment, and that the subsequent statute was not a local or special law, citing Swartz v. Carlisle Borough, supra, and the Minnesota case of State v. Brown, supra, and saying:

"It being within the power of the law-making body, in due and proper form, originally to have authorized the work in question, there can be no doubt of the legislature's right subsequently to ratify what it might have previously authorized, and this it does by the act now before us."

It was argued in that case that to make the subsequent act curative legislation, in the proper legal sense, it should have corrected the errors of the prior act which had been declared unconstitutional, and that the contractors, as a prerequisite to any recovery, would have to proceed with their work on a new authority under a curative act so drawn. But the court refused its assent to those contentions, and held that if the improvement was made without authority because of the invalidity of the act under which the county had proceeded, that was not a valid objection to the validity of the curative act, since it was not the purpose of such an act to cure the defect in the void statute, but to ratify what had been done under it.

The question of the necessity or propriety of determining the validity of a curative statute upon the theory that it confers original authority, or must be sufficient for that purpose, is so well considered by the United States Supreme Court in an opinion by Mr. Chief Justice White, and its application here seems so apparent, that we feel justified in referring to it at some length, notwithstanding that

it does not involve a question of general or special legisla-
tion. The case is United States v. Heinszen & Co., 206
U. S. 370, 27 Sup. Ct. 742, 51 L. ed. 1098, 11 Ann. Cas.
688, wherein it appeared that certain tariff duties upon
goods going into the Philippine Islands had been collected
without legal authority, and thereafter an act of Congress
was passed legalizing and ratifying such duties and the
collection thereof as fully as if the same had been specific-
ally authorized and directed by a prior act of Congress.
A discussion of the general question was introduced by
the learned Chief Justice as follows:

"As the text of the act of Congress is unambiguous and
manifests as explicitly as can be done, the purpose of Con-
gress to ratify, the case comes to the simple question
whether Congress possessed the power to ratify which it
assumed to exercise. When the controversy is thus re-
duced to its ultimate issue we think the error committed
by the court below (denying the right), both in reason
and authority, is readily demonstrable. That where an
agent, without precedent authority, has exercised in the
name of a principal a power which the principal had the
capacity to bestow, the principal may ratify and affirm the
unauthorized act, and thus retroactively give it validity
when rights of third persons have not intervened, is so
elementary as to need but statement. That the power of
ratification as to matters within their authority may be
exercised by Congress, state governments and municipal
corporations, is also elementary."

Coming then to the question of the nature of the cura-
tive act in that case, it was said (italics ours):

"As the duties collected were illegal, it is insisted that
for the purpose of testing the validity of the act of Con-
gress *the fact of such collection must be put out of view,
and the act ratifying the exaction must be treated as if it*

*were solely an original exercise by Congress of the taxing power.* \* \* \* But *the proposition begs the question* for decision, by shutting out from view the potential fact that when the goods were brought into the Philippine Islands there was a tariff in existence under which duties were enacted in the name of the United States. *Indeed the contention* goes further even that this, since it entirely *disregards the important consideration* that although the duties were illegally exacted *the illegality was not the result of an inherent want of power* in the United States *to have authorized the imposition of the duties,* but simply arose from the failure to delegate to the official the authority essential to give immediate validity to his conduct in enforcing the payment of the duties. \* \* \* Moreover, the *fallacy* which the proposition involves *becomes yet more obvious* when it is observed that the *contention cannot even be formulated without misstating the nature of the act of Congress;* in other words, without treating that act as retrospective legislation enacting a tariff; when on its very face the act is but an exercise of the conceded power \* \* \* *to ratify* an act done on behalf of the United States which the United States could have originally authorized."

That needs no explanation. No question as to the form of the statute was involved, but its validity was denied upon the ground that Congress could not then confer authority for the collection of duties previously illegally exacted and collected. But the court decided that the statute was not to be considered as an original exercise of the taxing power, or as conferring original authority, but as what it appeared to be, an exercise of the power to ratify an act which might have been originally authorized.

A like contention disposed of in the same way is found in Edwards v. Nash County Board, 183 N. C. 58, 110 S. E. 600. That case involved a curative act validating a tax levied by a county board without authority, but under the

mistaken impression that it was authorized by a statute under which a like tax for previous years had been levied. It was contended that the curative act was only an ineffective effort to impart vitality to a levy that was entirely void. But it was upheld as a proper exercise of the power to cure defects in acts done where the legislature originally had authority to confer the power or authorize the act. And the cases are numerous sustaining statutes validating defective proceedings in the matter of taxation.

If there is such a radical distinction between the nature of an act granting original authority and one ratifying what has been done without authority, may there not also be as broad a distinction between the form of an act authorizing certain proceedings and a curative act within the meaning of a constitutional provision requiring such proceedings to be provided for by general law? Indeed, there are many decisions to the effect that curative acts are not affected or controlled by a constitutional provision against special legislation. Thus it was said in California, in the case of San Pedro, L. A. & S. L. R. Co. v. Hamilton, 161 Cal. 610, 119 Pac. 1073; 37 L. R. A. (N. S.) 686:

"The Legislature, by its general validating act, as has been said, admittedly confirmed the lease made by the city of Long Beach. Stats. 1907, p. 987. If this confirmatory act is valid, it, of course, cures any defects in the lease from the town of San Pedro, which may be thought to exist by reason of the lack of power in that municipality. Against the validity of the act, it is contended that it is special legislation. But this contention is completely answered by Upham v. Hosking, 62 Cal. 250, Baird v. Monroe, 150 Cal. 560, 89 Pac. 352, and Redlands v. Brook, 151 Cal. 474, 91 Pac. 150. The principle of decision is that such curative acts do not come within the constitutional inhibition against special legislation. Elsewhere the same principle of decision is uniformly applied." (citing Read

v. Plattsmouth, State v. Squires, and State v. Brown, supra.)

It was said in Minnesota in Flynn v. Little Falls E. & W. Co., 74 Minn. 180; 77 N. W. 38, 78 N. W. 106:

"We think that counsel have overlooked the fact that this is merely a curative act intended to provide for a temporary object, to-wit, the legalizing of existing village ordinances and contracts. For such a purpose, a really distinctive class may, and often must, be based upon existing temporary circumstances. * * * Hence the act is not subject to the objection of being special legislation, if it includes all existing village ordinances and contracts simliarly situated as respects the subject and object of the act."

And in State v. Spaude, 37 Minn. 322, 34 N. W. 164, the same court, declaring valid an act legalizing the incorporation of villages attempted to be incorporated under a void general statute, said:

"Had it been valid in other respects, and the incorporation of villages under it had failed by reason of omitting some of its provisions, a curative act like the act of 1885, if it reached all villages within that predicament, could hardly have been called a special law within the meaning of the constitution."

As shown in the former opinion, the act in question, though referring specifically to the one county by name, includes every locality in the state with respect to the subject of counties affected by the conditions sought to be remedied. The act itself refers to the geographical conditions of the county as requiring legislation applicable to that county alone. It may, therefore, notwithstanding its form, be regarded as a general law, if that should be nec-

essary to its validity. Or, if its form should be deemed
sufficiently important to require it to be considered as a
special law, then it might be upheld, as also stated in the
former opinion, upon the theory that a law more general
in form and operation would not be applicable, because
there would be no other locality within which it might
operate, since it was to have a retroactive operation only.
Cole v. Dorr, supra; City of Pullman v. Hungate, 8 Wash.
519, 36 Pac. 483; State v. Abraham, 64 Wash. 621, 117
Pac. 501; McGarvey v. Swan, 17 Wyo. 120, 95 Pac. 697;
Dawson Soap Co. v. Chicago, 234 Ill. 314; 84 N. E. 920,
14 Ann. Cas. 1131; Verner v. Muller, 89 S. C. 545; 72 S. E.
393; People v. McFadden, 81 Cal. 489, 22 Pac. 851, 15 Am.
St. Rep. 66. The Supreme Court of Washington said in
Pullman v. Hungate:

"The fact that the inhabitants of a certain locality, by
their own action, have assumed to act in a particular ca-
pacity, distinguished from that of the people at large, so
separates them, as a class, from the rest of the people of
the state that the legislature may properly deal therewith
in a different manner than with the rest of the people
without its action being special legislation."

In Verner v. Muller, the South Carolina Supreme Court
said:

"It is also contended that the act of 1908 is a special
law  *  *  *:  The purpose of the act was to provide for
free bridges across the Congaree and Broad rivers in this
state between Columbia township in Richland county and
the County of Lexington. The court takes judicial notice
of the geographical situation and the fact that the state
capital, Columbia, is situated in Columbia township, near
the confluence of these rivers. The object to be accom-
plished related to a corporate purpose of Columbia town-
ship, and the situation was one which could not have been
dealt with by a general law."

And the Supreme Court of California, in People v. McFadden:

"While it may be found practicable to, and the legislature has already endeavored, by a single act, to provide a uniform system of county government, we can hardly conceive it possible, in view of the varied conditions of the different localities in the state, if indeed, it can be done in any state, to frame a single law which would meet the necessities of each attempt to organize a new 'political subdivision of the state.' "

And it was held in that case that the legislature might classify each new county, according to the best information at its command, until a readjustment of the classification of all of the counties should take place under the provisions of a general law on the subject.

Although we have rested our conclusion upon the principal question in the case upon the reasons above stated, we are not to be understood as assenting to the proposition that the Legislature might not legally have made such provision in its general law for the organization of counties as would have authorized the organization of Teton County with a less population and less assessed property valuation than that prescribed in the statute as a condition for the organization of other unorganized counties. That might, we think, be a question of classification. It is not necessary to decide the question and we shall not do so. But we think it proper to say that we are not prepared to hold that such a provision might not be made in a general law for the purpose stated, through a reasonable classification with respect to geographical conditions, transportation facilities, means of communication, and other conveniences, having a reasonable relation to the question of the necessity or propriety of establishing a county government; even though a class relieved from such conditions might temporarily, at least, include but one locality or

unorganized county, if any. Indeed, there have been times during the existence of our general law on the subject when there was no unorganized county upon which it might operate; and at this time, with Teton organized, there is none remaining unorganized.

The fact is, as we judicially know, that the territory within the boundaries of Teton County is surrounded on all sides by high mountain ranges, without railroad communication with the county seat of the parent county, except by wagon road over a mountain pass about 28 miles to a railroad station in Idaho more than 100 miles from said county seat. Indeed, there was not then and is not now any railroad within said boundaries. And for many months during each year it was very difficult, and at times practically impossible, for the people of that area to reach the county seat of the county to which they then belonged, and the expense was usually too great for a trip upon ordinary business. This matter was no doubt considered by the legislature in 1921, when the county was created and formed and when its boundaries were defined, for it was provided in the first paragraph of the act creating the county (Laws 1921, Ch. 53,) as follows:

"All that portion of the territory of the state of Wyoming now comprising the county of Lincoln embraced within the following described boundaries shall be known as Teton County, notwithstanding the provisions of section 1281, Wyoming Compiled Statutes of 1920."

The stated section is the section containing the provisions of the general law for the organization of counties which were ignored or not complied with in the proceeding to organize the county. See Budge v. Lincoln County Commrs., 29 Wyo. 35, 208 Pac. 874. Those provisions, however, did not relate to the creation or formation of a county, but operated only as a regulation of proceedings to organize a county, as held in the case last cited. They

seem, however, to have been accepted by the people of the newly created county, as well as the Governor, throughout the organization proceedings, as a legislative expression to the effect that said county would not be subject to the provisions of the general law as to population and assessed valuation of property in excess of what is required by the Constitution. And we see no reason to doubt that said proceedings were instituted and conducted in good faith, though we do not think the question of good faith material in this case.

Having elected its county officers and assumed the position of an organized county, the legislature at its next succeeding session in 1923, not only declared the organization to be valid by the curative act here in question, but at that session also a section of the act creating the county which had provided that until its organization it should continue to be attached to Lincoln County for all purposes of legislative representation was repealed, and it was provided by the same act that any county theretofore or thereafter organized to which separate representation had not been assigned should constitute a separate senatorial and representative district, and that the qualified voters of that county shall elect at the next general election (in 1924) one senator and one representative, and shall continue to do so until another apportionment of senators and representatives shall be made by statute, thus giving Teton County separate legislative representation only. Laws 1923, ch. 27. At the same session also a statute was enacted dividing the state into judicial districts, and placing the county of Teton, together with three other counties, within and as composing the third district, and providing further that in said County there should be held one regular term of the district court in each year, beginning the third Monday in June. Laws 1923, Ch. 77. And a term was held in said county in June, 1923. Thus, not only was the organization of the county declared to be valid, but it was recognized as a county by

the very important acts aforesaid, presenting a situation to be overcome only by the strongest kind of showing.

Two other grounds are stated in the petition for rehearing. 1, that the relators ''are now prepared to show that since the filing of the original petition, the assessed valuation of Teton County had been determined at an amount less than the amount fixed by the legislature in the curative act aforesaid.'' 2. That they are now prepared to show that since the commencement of this action the county tax had been fixed at seven mills, while the county tax of Lincoln County, from which the new county was taken, had been fixed at only 3.3 mills, which constitutes an excessive and intolerable burden on the tax-payers of the area embraced in Teton County, whereby their property will be taken without due process of law.

It is sufficient to say as to these two grounds: The question as to population and the amount of assessed or assessable valuation of property as a condition to the county's organization is not the population and the amount of valuation when this action was commenced, or at any time since then. But, so far as material at all, the time to be considered as to those matters is the date of the organization of the county, or the date of the proceedings therefor. We think that too clear to require further discussion. See 15 C. J. 395. If the county has been legally organized or has come legally into existence as a county because of the curative act, and we think it has, the fact that it has levied a larger tax than has been levied in the same year by the parent county is no ground whatever for holding its organization illegal. And certainly, if the rate levied comes within the constitutional or statutory maximum limitation, it would not amount to the taking of property without due process of law. Or if it did, the question would not be material in this proceeding.

This case, not only because of its importance, but because also of the serious questions involved, received our very careful and exhaustive consideration upon the orig-

inal hearing. We have not felt any necessity, therefore, for another oral argument, but we have re-examined the principal questions involved in view of the arguments made in the brief in support of the petition for rehearing. We remain convinced, however, that a rehearing would not result in a change of the views in which we all concur, and therefore we are of the opinion that the petition for rehearing should be denied, and it will be so ordered.

*Rehearing Denied.*

Blume, J., and Kimball, J., concur.

NOTE—See (1) 36 Cyc. p. 987; (2) 36 Cyc. p. 987; (3) 12 C. J. p. 1091; 36 Cyc. pp. 1016, 1017; (4) 12 C. J. pp. 749, 1084, 1085; (5) 23 C. J. pp. 82, 83, 89; (6) 15 C. J. p. 395 (1926 Anno.); (7) 12 C J. p. 1255; 15 C. J. p. 396 (1926 Anno.).