KEARSE, Circuit Judge:
Plaintiff The Republic of Iraq (or the “Republic”) appeals from a judgment of the United States District Court for the Southern District of New York, Sidney H. Stein, Judge, dismissing its claims under the Racketeer Influenced and Corrupt Organizations Act (“RICO”), 18 U.S.C. §§ 1961 et seq., the Foreign Corrupt Practices Act (or “FCPA”), 15 U.S.C. §§ 78dd-l- et seq., and common law, against numerous defendants who are alleged to have conspired in 1997-2003 with Iraq’s then-president Saddam Hussein *152 and Iraq’s ministries and state-owned enterprises to corrupt and plunder an international humanitarian program administered by the United Nations (or “U.N.”), known as the Oil-for-Food Programme (or the “Programme”). Defendants moved to dismiss the Republic’s First Amended Complaint (the “Amended Complaint” or “Complaint”) principally pursuant to Fed.R.Civ.P. 12(b)(1) and 12(b)(6). They moved to dismiss pursuant to Rule 12(b)(1) on the grounds that the Republic’s claims are nonjusticiable by reason of the act-of-state doctrine and the political-question doctrine and on the ground that the Republic lacked standing to seek relief. Defendants moved to dismiss pursuant to Rule 12(b)(6) for, inter alia, failure to state a claim on which relief can be granted, arguing that RICO does not apply to a conspiracy involving primarily foreign actors and foreign acts, that the FCPA does not provide a private right of action, that the Republic was in pari delicto with defendants, and that the Complaint failed to allege proximate causation. The district court granted the Rule 12(b)(6) motions on those grounds; it also ruled that the Republic’s remaining claims arose under state law rather than federal law, and it declined to exercise supplemental jurisdiction over them.
On appeal, the Republic challenges these rulings. As to the in pari delicto ruling, the Republic contends principally that that doctrine was inapplicable on the ground that the conduct of Hussein and Iraq’s ministries is not attributable to the Republic because that conduct was adverse to the interests of Iraq and its citizens. For the reasons that follow, we conclude that (1) the RICO claims were properly dismissed on the basis of in pari delicto; (2) the Republic does not have a right of action under the FCPA; and (3) the common-law claims arose under state law, and the district court properly declined to exercise supplemental jurisdiction over them. We affirm the judgment on these bases and need not address the Republic’s challenges to the district court’s other rulings.
I. BACKGROUND
The principal legal premise of the Republic’s Amended Complaint is that the “Hussein Regime,” defined as “Saddam Hussein and his representatives” (Amended Complaint ¶ 2), although it “was in de facto control of the nation, ... was not a de jure or legitimate government” (id. ¶ 220). The factual allegations of the Amended Complaint, together with public documents that were before the district court, may be summarized, as relevant to this appeal, as follows.
A. Saddam Hussein’s Regime in Iraq
Saddam Hussein, the former president of The Republic of Iraq, rose to power in 1979 in a military coup and remained in power for more than two decades. Hussein consolidated his authority over Iraq by harshly and “systematically removing] all opposition” and “installing] officials under his direct control in all areas of the government.” (Amended Complaint ¶¶ 217-218.) The Hussein Regime further suppressed opposition by means of, inter alia, imprisonment and execution of dissidents, and use of chemical weapons and force against civilian opponents, causing birth defects and many thousands of deaths.
In 1980, Hussein caused the Iraqi army to invade Iran, starting an eight-year war in which Iraq used chemical weapons against Iranian troops and ballistic missiles against Iranian cities. On August 2, 1990, Iraq invaded Kuwait, beginning a seven-month occupation during which Iraq killed and committed numerous abuses against Kuwaiti civilians. Ultimately, af *153 ter his regime was deposed in 2003, Hussein was convicted in an Iraqi court for crimes against humanity, having been found responsible for the systematic and widespread attack on civilian inhabitants of an Iraqi town, and was executed by Iraqi authorities.
In the meantime, the international community’s reaction to Iraq’s invasion of Kuwait was swift and censorious. The United Nations Security Council (“Security Council”), on the day of the invasion, “[c]ondemn[ed] the Iraqi invasion of Kuwait,” “[d]emand[ed] that Iraq withdraw immediately and unconditionally all its forces to the positions in which they were located on 1 August 1990,” and “[c]all[ed] upon Iraq and Kuwait to begin immediately intensive negotiations for the resolution of their differences.” S.C. Res. 660, ¶¶ 1-3, U.N. Doc. S/RES/660 (Aug. 2, 1990) (“Resolution 660”) (italics in original). On August 3, 1990, the President of the United States — which had established diplomatic relations with the Hussein-led government of Iraq in 1984, see U.S. Department of State, Office of the Historian, A Guide to the United States’ History of Recognition, Diplomatic, and Consular Relations, by Country, since 1776: Iraq, at http://history.state.gov/countries/iraq (last visited September 16, 2014); 1984 PUBLIC PAPERS OF THE PRESIDENTS OF THE UNITED STATES: RONALD REAGAN 1834 (1987) — issued an Executive Order finding that “the policies and actions of the Government of Iraq constitute an unusual and extraordinary threat to the national security and foreign policy of the United States” and “declaring] a national emergency to deal with that threat” (Amended Complaint ¶ 248 (internal quotation marks omitted)). On August 6, 1990, Iraq not having complied with the Resolution 660 demands, the Security Council adopted a resolution to impose on Iraq economic sanctions of “unparalleled” “scope and intensity” (Amended Complaint ¶ 293 (internal quotation marks omitted)), calling on all States to embargo trade and financial transactions with Iraq. See S.C. Res. 661, ¶¶3-5, U.N. Doc. S/RES/661 (Aug. 6, 1990) (“Resolution 661”). The United States government implemented these sanctions, and soon thereafter designated Iraq as a state sponsor of terrorism.
In February 1991, an international military coalition repelled Iraqi forces from Kuwait. After United Nations fact-finding missions to Iraq in March 1991 found immense suffering in the Iraqi population, the Security Council adopted a resolution that, while continuing most of the sanctions imposed by Resolution 661, would have allowed the export of foodstuffs to Iraq if Iraq agreed to certain conditions. See S.C. Res. 687, ¶20, U.N. Doc. S/RES/ 687 (Apr. 3, 1991). Two other Security Council resolutions in 1991 would have allowed the Hussein Regime to sell Iraqi oil in return for food and medicine. The Hussein Regime, however, was unwilling to participate in such humanitarian transactions on the conditions required by the United Nations; instead, it used the suffering of the Iraqi people as a negotiating tool in pressing for an end to the economic sanctions. For years, the Iraqi people continued to suffer and starve.
B. The Oil-for-Food Programme
The impasse ended in 1996, when the Hussein Regime agreed, in a Memorandum of Understanding (“MOU”), to participate in a new United Nations plan, the Oil-for-Food Programme. See S.C. Res. 986, U.N. Doc. S/RES/986 (Apr. 14, 1995). Iraq was to be allowed to sell its petroleum and petroleum products (collectively “oil”) to foreign purchasers and to use the proceeds of those sales to purchase from foreign vendors food and other humanitarian *154 goods to benefit Iraq’s civilian population. From the perspective of the United Nations, the Programme was intended “as a means for reconciling strong sanctions against a corrupt Iraqi regime with [the] need [to get] supplies of food and medicines to an innocent and vulnerable population.” (Amended Complaint ¶ 296 (internal quotation marks omitted).)
The Programme, overseen by a United Nations international committee called the “661 Committee” — named in reference to Resolution 661 — was designed to prevent Iraqi leaders from using proceeds of oil sales for political and personal ends. The Programme’s features included requirements for U.N. approval of every contract for Iraq’s sale of oil and every contract for Iraq’s purchase of goods, and for the establishment of an “Escrow Account,” at a bank selected by the United Nations, through which all payments to and by Iraq would be made.
Each purchaser of Iraqi oil was required to make full disclosure of the terms of the contract; every contract incorporated U.N. regulations. The price to be paid, known as the “Official Selling Price” or “OSP,” was set monthly by the United Nations in an attempt to reflect fair market value. The contract price was supposed to represent the entire purchase price for the oil. The oil purchases were guaranteed by letters of credit in favor of the Escrow Account, into which all moneys would be paid.
The Programme permitted Iraq to use Escrow Account funds to purchase “medicine, health supplies, foodstuffs and materials and supplies for essential civilian needs,” to be distributed equitably to “the Iraqi population throughout the country.” (Amended Complaint ¶ 280 (internal quotation marks omitted); see id. ¶ 328.) Iraqi government ministries and state-owned enterprises negotiated contracts for the purchase of these goods. The 661 Committee or its delegatee reviewed each contract to see that it was in accordance with “normal commercial practice,” acceptable “price and value,” and United Nations policies. (Id. ¶¶ 328, 335 (internal quotation marks omitted).) After each contract was approved, the United Nations authorized the execution of a letter of credit against the Escrow Account, from which payment would be made to the vendor upon delivery of the goods in Iraq.
During the Programme’s seven years, $64.2 billion was deposited into the Escrow Account from the sale of Iraqi oil. Approximately $37 billion was spent to purchase humanitarian goods, and another $18 billion was disbursed to satisfy Kuwaiti claims against the Iraqi government. (See id. ¶ 306.) Following the downfall of the Hussein Regime, the remaining balance in the Escrow Account was transferred to an account owned by the Republic.
C. Subversion of the Programme
Notwithstanding United Nations goals for and oversight of the Programme, the Hussein Regime, which was concerned with maintaining its power, found ways to turn the Programme to its own advantage and to undermine the economic sanctions. The fact that the Programme permitted the Iraqi government to choose with whom it dealt allowed the Hussein Regime to make covert side arrangements both with foreign buyers of oil and with sellers of humanitarian goods and to divert money intended for the welfare of the Iraqi people.
First, the Hussein Regime “curr[ied] political favor” and rewarded political allies abroad by selling them oil at prices below fair market value. (Amended Complaint ¶¶ 355-361.) It accomplished this, in part, by having allies provide a U.N. committee with “false market data” and “lobb[y]” that *155 committee to set an OSP that was artificially low. (Id. ¶¶ 384-385.) Such low prices allowed purchasers to assign their interests (which was impermissible without U.N. approval) or to resell at a profit, with no risk or effort.
Thereafter, Iraq began requiring that anyone who wanted to purchase oil under the Programme pay “surcharges” — “illicit” side payments added to the per-barrel price of the oil sold. (Id. ¶ 363; see, e.g., id. ¶¶ 395, 423, 440, 468, 512.) In addition, the Hussein Regime began imposing new surcharges characterized as “port fees,” demanding those payments before permitting cargo ships to load oil at Iraqi ports. (Id. ¶ 365 (internal quotation marks omitted).) The purchasers of Iraq’s oil paid the surcharges through “bank accounts owned or controlled by the Hussein Regime” in foreign countries. (Id. ¶ 363; see, e.g., id. ¶¶426, 473, 512.) The approved contract prices for the oil were sufficiently below the market price to allow these kickbacks to be paid and still allow the purchasers to resell the oil and enjoy “excessive profits.” (Id. ¶ 384.) Thus, instead of negotiating contracts for the sale of oil at market value, all of the proceeds of which would have gone, via the Escrow Account, toward the purchase of humanitarian goods, the Hussein Regime diverted a portion of that market value into the Regime’s coffers.
The Complaint alleged that the underpricing of oil ended in 2002 after the United Nations became fully aware of it and instituted “retroactive oil pricing to ensure oil was purchased at market rates.” (Amended Complaint ¶ 378; see id. ¶ 1108.) Before that change, the surcharges that would have been part of a market-value purchase price, but were paid to the Hussein Regime instead of to the Escrow Account, totaled approximately $228.8 million. (See id. ¶ 1101.) In all, the underpricing, which ranged from $1 to $4 per barrel, resulted in losses to the Escrow Account of at least $1.8 billion. (See id. ¶¶ 1103-1104.)
The Hussein Regime found even more lucrative ways to profit from the purchasing side of the Programme. First, the Hussein Regime required all of Iraq’s ministries to fabricate “non-negotiable ‘transportation fees’ on goods requiring inland delivery.” (Id. ¶ 527.) Although the vendors included charges for such transportation in their contract prices, and they received payments for those charges from the Escrow Account, no legitimate transportation services were provided, and the fees thus included were kicked back to the Hussein Regime (see id. ¶¶ 530-535).
Thereafter, the Hussein Regime added so-called “after-sales-service-fee[s]” on all purchase contracts under the Programme. (Id. ¶ 558 (internal quotation marks omitted).) These fees, which were also included in the contract prices, were “mandatory kickback[s]” (id. ¶ 566 (internal quotation marks omitted)) to the Hussein Regime, and ranged from 2 to 30 percent of the purchase price of the goods (see id. ¶¶ 561, 563).
Both sets of fees violated the terms of the Programme, which permitted the payment only of legitimate service fees for “services ... ancillary to the supply of material goods” (id. ¶ 572 (internal quotation marks omitted)). The suppliers of humanitarian goods paid the kickbacks to the Hussein Regime “in one of three ways: cash, transfers to Regime-controlled accounts, or payments to front companies controlled by individuals or companies loyal to the Hussein Regime.” (Id. ¶ 565; see, e.g., id. ¶ 536 (cash); id. ¶¶ 599, 859 (foreign bank accounts); id. ¶¶ 530, 536 (front companies).) The sham transportation and after-sales-service fees totaled *156 some $1.55 billion. (See id. ¶¶ 555, 620, 1111.)
In addition to paying sham fees using escrowed funds, the vendors profited by pricing their goods above fair market value, as well as by delivering substandard goods. (See Amended Complaint ¶¶ 640-655.) The Complaint estimated that the cost to the Escrow Account of the delivery of substandard and overpriced goods was at least $7 billion. (See id. ¶¶ 655, 1112.)
D. The Claims Against Defendants
On the basis of these events, the Amended Complaint asserted claims against three groups of defendants. Five defendants are characterized as “Oil Purchasing Defendants.” They include defendants David B. Chalmers, Jr., and Oscar S. Wyatt, Jr., who had personal ties to the Hussein Regime and who have pleaded guilty to conspiracy offenses related to Programme corruption. (See Amended Complaint ¶¶ 397-407, 478-492.) The other three Oil Purchasing Defendants are energy firms, one of which was affiliated with Wyatt. These firms purchased Iraqi oil through the Programme, either directly or indirectly, and paid surcharges, either directly or indirectly, to the Iraqi government. (See id. ¶¶ 421-475.) Two of these firms entered into non-prosecution agreements with the Department of Justice, and the third pleaded guilty in state court to grand larceny, in relation to their roles in the Programme corruption. (See id. ¶¶ 424, 442, 462-464.)
Six other defendants, BNP Paribas USA and five affiliates (collectively “BNP”), are banking entities. BNP was the bank at which the United Nations established the Escrow Account through which the Oil Purchasing Defendants paid for Iraqi oil and through which Iraq paid for the humanitarian goods it purchased. The Escrow Account was located at BNP Paribas USA in New York City. (See Amended Complaint 1111286, 975, 978.) Under the terms of its agreement with the United Nations and a United States government license to deal in Iraqi funds, BNP was obligated to conform its conduct to the Programme’s rules. Notwithstanding this obligation, BNP, which issued letters of credit for a majority of the oil purchases under the Programme, contravened Pro-gramme regulations and its agreement with the United Nations by, inter alia, “cooperating] with the Oil Purchasing Defendants to hide material information from the UN” including its knowledge that “oil purchasers were paying a substantial premium over the OSP” and that some oil purchasers “were financing the purchase of oil ... by others” (id. ¶¶ 1022-1024); “ma[king] payments of Escrow funds without proper authorization from the United Nations” (id. ¶ 1038); and being “involved in the transfer of approximately $10 million in illicit surcharges paid to the Hussein Regime” (id. ¶ 1050).
All of the remaining defendants discussed in the Complaint are characterized as “Vendor Defendants.” Their businesses involved the sale of foodstuffs, pharmaceuticals, medical and agricultural supplies, industrial machinery, and vehicles; all of these defendants are alleged to have participated in the scheme to overcharge for their products and to pay part of the overage back to the Hussein Regime. (See Amended Complaint ¶¶ 800-974.) Several of the Vendor Defendants have admitted — in deferred prosecution agreements, plea agreements, or other public admissions — that they secretly paid illegal kickbacks on Programme contracts. (See id. ¶¶ 662-799.)
The Complaint principally asserted claims against all defendants under RICO. It alleged that the Oil-for-Food Pro-gramme was a RICO enterprise, either in *157 itself or as associated in fact with, inter alia, defendants and the 661 Committee; the Complaint alleged that defendants conducted or participated in the conduct of the enterprise through a pattern of racketeering activity involving, inter alia, mail and wire fraud, money laundering, and bribery, in violation of 18 U.S.C. § 1962(c), and conspired to do so in violation of id. § 1962(d). The Complaint also alleged that, by paying kickbacks to the Hussein Regime, the Vendor and Oil Purchasing Defendants violated the Foreign Corrupt Practices Act, 15 U.S.C. §§ 78dd-l et seq.
The Complaint asserted, inter alia, common-law claims against BNP for breach of its fiduciary duty to Iraq; claims against two of the Oil Purchasing Defendants for inducing BNP to breach that fiduciary duty; claims against all defendants for fraud and conspiracy to commit fraud in dealing with the United Nations in connection with the Programme, for breach of their contractual commitments to the United Nations, and for unjust enrichment resulting from the excessive profits made as a result of their illegal kickbacks to the Hussein Regime; and claims against all defendants for inducing the Hussein Regime to breach its fiduciary duties to the Iraqi people.
E. The District Court Decision
Defendants moved to dismiss the Amended Complaint pursuant to Rule 12(b)(1) on a variety of jurisdictional grounds, and pursuant to Rule 12(b)(6) for failure to state a claim for a variety of reasons. In a thorough opinion reported at 920 F.Supp.2d 517, the district court rejected defendants’ jurisdictional arguments; but it granted defendants’ motions to dismiss the Republic’s RICO claims on the alternative grounds of (1) lack of extraterritorial applicability of RICO, (2) the defense of in pari delicto, and (3) the Amended Complaint’s failure to allege that defendants’ racketeering activity was the proximate cause of the Republic’s injuries. See id. at 542-50. The court also agreed with defendants that “the FCPA offers no private right of action.” Id. at 551. And, concluding that the Republic’s common-law claims arose under state rather than federal law, the court declined to exercise supplemental jurisdiction as to those claims. See id.
In addressing the in pari delicto defense, the district court stated in part as follows:
Iraq has attempted to fit this wrongdoing into the mold of a civil action. At its heart, Iraq says, its case amounts to a principal seeking to recover for the harms caused to it by a wayward agent — Saddam Hussein — and his co-conspirators the defendants in this action ....
Defendants have now moved to dismiss Iraq’s First Amended Complaint (“Complaint”) on a variety of theories, almost all of which touch on the relationship of Iraq to the wrongs for which it seeks relief. The parties agree that the injustices alleged were instigated and directed by Hussein and his Regime. But the parties dispute whether the Republic of Iraq must bear responsibility for the acts of the Hussein Regime and, if so, what that responsibility means for this action.
The Court concludes that the Complaint alleges conduct by the Hussein Regime that, as a matter of law, is attributable to plaintiff itself, the Republic of Iraq. The alleged misconduct has a governmental character. Therefore, the conduct comes within the default rule that a regime’s governmental conduct redounds to the sovereign. The Court rejects Iraq’s view that it may sidestep responsibility because the conduct was *158 illegal or the actors held power illegitimately. Sovereigns ... cannot escape the consequences of their representatives’ governmental misconduct. Questions of attribution are distinct from questions of lawfulness or legitimacy.
The legal relationship between Iraq and Hussein frames the case.... Having engineered the wrongdoing alleged in the Complaint, and having alleged that the wrongdoing directly harmed the Programme, Iraq cannot recover from that wrongdoing.
920 F.Supp.2d at 524 (emphases added).
The district court noted that “the U.S. Government treated the Hussein Regime as the effective government during the relevant time period,” that “[t]he United Nations also treated the Hussein Regime as the effective Iraqi government,” and that plaintiffs counsel during oral argument stated, inter alia, “ ‘We agree his regime was the president of Iraq, the government of Iraq, the agent of Iraq.’ ” Id. at 535.
The legal relationship between the sovereign Republic of Iraq, the Hussein Regime, and the Iraqi people frames this litigation. That relationship rests on time-tested principles:
• The change in governments — from the Hussein Regime; to the Coalition Provisional Authority that governed subsequent to the fall of Saddam Hussein; to the contemporary Republic — did not create an entirely new state. Rather, those changes altered the leadership and government of a continuously existing state. Therefore, the Republic of Iraq is the same sovereign entity as the one controlled by the Hussein Regime ....
• [T]he rights of a sovereign state are vested in the state rather than in any particular government which may purport to represent it.... That is, Hussein, the Hussein Regime, and the Republic of Iraq are not one and the same; they are different governments over time that represent the same sovereign state....
• Notwithstanding the distinction between a state and its government, a government may bind the sovereign it represents....
920 F.Supp.2d at 535-36 (internal quotation marks omitted). Based on these principles, the court concluded that “as a matter of law, the Republic of Iraq bears responsibility in this action for the Hussein Regime’s corruption of the Programme.” Id. at 536.
Because sovereigns operate through their governments, both domestic and international law ordinarily impute to a sovereign the acts of its government. For example, governments set policy, hold property, and conduct foreign affairs. The consequences of these governmental acts trace back to the sovereign. ... So do wrongful acts by those governments. “A state is responsible for any violation of its obligations under international law resulting from action or inaction by [ ] the government of the state.... ” Restatement (Third) of Foreign Relations Law of the United States § 207 (1987)....
Moreover, the consequences of one government’s acts may redound to the sovereign even after that government has been replaced.
920 F.Supp.2d at 536. While noting that “it is possible for the persons who comprise the government to act without acting as the government,” id. at 537, the court recognized that “a sovereign may be held to account for the governmental conduct of the persons serving as its government.” Id. (emphasis in original). The court concluded that the “the Hussein Regime’s *159 Programme misconduct” alleged in the Amended Complaint was governmental. Id. at 538.
The Complaint alleges conduct by the Hussein Regime done under the color of its authority as the government of Iraq. Therefore, the Programme conduct of the Hussein Regime should be attributed to Iraq for the purposes of this action.
First, the Complaint alleges that the Hussein Regime’s “main goal” was to “undermine UN sanctions and the U.S. law prohibiting transactions with State Sponsors of Terrorism.” (Comply 7.) Hussein declared the Iraq Sanctions Program to be a form of “economic occupation” implemented by the “enemy.” {Id. ¶ 302.) Thus, the alleged misconduct represents choices made by the Regime in the conduct of its foreign affairs....
Second, the Complaint alleges that the Hussein Regime implemented its scheme by using its powers to engage with the UN. The Hussein Regime made the corruption possible, not just because it was in a position to corrupt the Pro-gramme, but because it agreed to the creation of the Programme in the first place: it did so in its capacity as the Government of Iraq. {See MOU § 10 (signature of Abdul Amir Al-Anbari “for Government of Iraq”).) Additionally, the Complaint alleges that the Hussein Regime (and defendants) effectuated their scheme by submitting false contracts to the UN. The Hussein Regime could negotiate those contracts only by virtue of its status as the effective government of Iraq. Thus, the Regime engaged in international transactions of an official character.
Third, the Complaint alleges that the Hussein Regime acted through government offices and officers to pursue its goal of frustrating the Iraq Sanctions Program:
• Hussein ordered government agencies to effectuate the scheme. “[0]n October 25, 2000, all Iraqi ministries were informed that Saddam Hussein had ordered the imposition of kickbacks of at least 10% in order to subvert the policies of the UN and the United States government.” (Comply 302.)
• Government agencies negotiated the transactions. “The Iraqi State Oil Marketing Organization (SOMO) was the legal entity that entered into the contracts with companies purchasing oil under the Programme.” {Id. ¶ 323.) On the goods side of the Pro-gramme, “a company wishing to sell humanitarian goods under the Pro-gramme contracted with the appropriate Iraqi Ministry or State-Owned Enterprise.... ” {Id. ¶ 329.)
• Government agents and agencies received the illicit funds. The Hussein Regime collected surcharges in accounts held “under the names of two SOMO employees” and then transferred the funds to “accounts of the Central Bank of Iraq.” {Id. ¶¶ 473-74.) [The Complaint] alleges that the Iraqi vice president directed that the after-sales-service fee revenue “be transferred to general treasury.” {Id. ¶ 568.) It also alleges that various governmental units or government-owned businesses collected fees and bribes. {E.g., id. ¶ 546 (Iraqi Ministry of Transportation); ¶ 550 (payments “going back to the Iraq Government”); ¶ 565 (“payments were transferred to Iraq in cash”).)
In sum, Iraq alleges that its injuries resulted from the Hussein Regime’s prosecution of its foreign affairs policy. The Complaint alleges a public goal, undertaken with public resources, pursued *160 for political purposes, and using means available only to state actors. These features lead the Court to conclude the Hussein Regime acted under the color of its authority as the government of Iraq for the purposes of this motion.
920 F.Supp.2d at 538-39.
The district court concluded that “the Complaint alleges that the Hussein Regime conceived and orchestrated the wrongful conduct with defendants’ assistance and thus it cannot proceed due to the defense of in pari delicto.” Id. at 550.
II. DISCUSSION
On appeal, the Republic challenges most of the district court’s unfavorable rulings. With respect to the dismissal of its RICO claims on the basis of in pari delicto, the Republic contends principally that that doctrine was inapplicable, arguing that the conduct of the Hussein Regime is not attributable to the Republic because that conduct was adverse to the interests of Iraq and its citizens. The Republic also argues that the question of comparative fault is a fact question that could not properly be resolved on a Rule 12(b)(6) motion; alternatively, it argues that the district court should have allowed it to amend its Amended Complaint. The Republic challenges the dismissal of its claims under the Foreign Corrupt Practices Act, arguing that the “line of authority” relied on by the district court for the proposition that the FCPA does not provide an implied private right of action “is in error” (Republic brief on appeal at 56) and that the legislative history demonstrates that Congress intended that such an implied right of action be recognized by the courts. The Republic also contends that, given the interest of the United States in speaking with a single voice on matters affecting foreign relations, the district court erred in ruling that the Republic’s nonstatutory claims arose under state law rather than federal common law.
Defendants, in addition to endorsing the district court’s Rule 12(b)(6) rulings, renew their challenge to the Republic’s standing under Article III of the Constitution to recover for injuries to the Republic’s proprietary interests, arguing that “Iraq itself instigated the alleged wrongs and received the illicit payments” (Defendants’ brief on appeal at 31). We reject this standing argument for substantially the reasons stated by the district court, see 920 F.Supp.2d at 531-32.
With respect to the RICO claims, we affirm the district court’s dismissal on the basis of the in pari delicto doctrine, and we thus need not address the Republic’s challenges to the other grounds on which the district court dismissed those claims. This dismissal was properly based on the Republic’s pleading, and we see no abuse of discretion in the district court’s denial of leave to amend the Amended Complaint. We also reject the Republic’s challenges to the dismissal of its FCPA claims and its nonstatutory claims.
A. The RICO Claims
The doctrine of in pari delicto, a term meaning “of equal fault,” reflects the principle that a plaintiff who has participated in wrongdoing equally with another person may not recover from that other person damages resulting from the wrongdoing. The principal contexts in which the Supreme Court has discussed the applicability of in pari delicto to a cause of action created by federal statutes are the antitrust laws, see Perma Life Mufflers, Inc. v. International Parts Corp., 392 U.S. 134, 88 S.Ct. 1981, 20 L.Ed.2d 982 (1968) (“Perma Life”), overruled on other grounds by Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984), and the securities *161 laws, see Bateman Eichler, Hill Richards, Inc. v. Berner, 472 U.S. 299, 105 S.Ct. 2622, 86 L.Ed.2d 215 (1985) (“Bateman Eichler”); Pinter v. Dahl, 486 U.S. 622, 108 S.Ct. 2063, 100 L.Ed.2d 658 (1988) (“Pinter ”).
In Perma Life, the Supreme Court reversed lower-court rulings that had upheld an in pari delicto defense asserted by a franchisor, Midas Muffler (“Midas”), against franchisees who alleged that their franchise agreements violated the antitrust laws. While stating that “the doctrine of in pari delicto, with its complex scope, contents, and effects, is not to be recognized as a defense to an antitrust action,” 392 U.S. at 140, 88 S.Ct. 1981, the Court noted that even a narrower defense of shared fault would have been inapplicable in the case before it because the record showed that “the illegal scheme was thrust upon the [franchisees] by Midas,” id. at 141, 88 S.Ct. 1981. Five Justices, however, opined that a defense to an antitrust claim should be recognized if the plaintiff really bore at least substantially equal responsibility for the violation. See id. at 146, 88 S.Ct. 1981 (White, J., concurring); id. at 147, 88 S.Ct. 1981 (Fortas, J., concurring in result); id. at 149, 88 S.Ct. 1981 (Marshall, J., concurring in result); id. at 156, 88 S.Ct. 1981 (Harlan, J., joined by Stewart, J., concurring in relevant part and dissenting in part).
In Bateman Eichler, the Supreme Court described Perma Life in part as follows:
In reversing ..., the opinion for this Court emphasized that there was no indication that Congress had intended to incorporate the defense into the antitrust laws, which “are best served by insuring that the private action will be an ever-present threat to deter anyone contemplating [illegal] business behavior.” [392 U.S.] at 139 [88 S.Ct. 1981]. Accordingly, the opinion concluded that “the doctrine of in pari delicto, with its complex scope, contents, and effects, is not to be recognized as a defense to an antitrust action.” Id., at 140 [88 S.Ct. 1981]. The opinion reserved the question whether a plaintiff who engaged in “truly complete involvement and participation in a monopolistic scheme” — one who “aggressively supportfed] and furtherfed] the monopolistic scheme as a necessary part and parcel of it” — could be barred from pursuing a damages action, finding that the muffler dealers had relatively little bargaining power and that they had been coerced by the franchisor into agreeing to many of the contract’s provisions. Ibid.
In separate opinions, five Justices agreed that the concept of “equal fault” should be narrowly defined in litigation arising under federal regulatory statutes. “[B]ecause of the strong public interest in eliminating restraints on competition, ... many of the refinements of moral worth demanded of plaintiffs by ... many of the variations of in pari delicto should not be applicable in the antitrust field.” Id., at 151 [88 S.Ct. 1981] (MARSHALL, J., concurring in result). The five Justices concluded, however, that where a plaintiff truly bore at least substantially equal responsibility for the violation, a defense based on such fault — whether or not denominated in pari delicto — should be recognized in antitrust litigation.
Bateman Eichler, 472 U.S. at 308-09, 105 S.Ct. 2622 (footnote omitted) (emphases added).
The Bateman Eichler Court concluded that “the views expressed in Perma Life apply with full force to implied causes of action under the federal securities laws.” 472 U.S. at 310, 105 S.Ct. 2622; see also Pinter, 486 U.S. at 635, 108 S.Ct. 2063 (same with respect to express causes of *162 action). The Bateman Eichler Court distilled a two-pronged standard incorporating both consideration of the plaintiffs relative degree of fault and concern for minimizing the frustration of law-enforcement goals. Thus, it stated that “a private action for damages” under the securities laws
may be barred on the grounds of the plaintiffs own culpability only where (1) as a direct result of his own actions, the plaintiff bears at least substantially equal responsibility for the violations he seeks to redress, and (2) preclusion of suit would not significantly interfere with the effective enforcement of the securities laws and protection of the investing public.
472 U.S. at 310-11, 105 S.Ct. 2622. As the Court noted in Pinter, “[t]he first prong of this test captures the essential elements of the in pari delicto doctrine,” 486 U.S. at 633, 108 S.Ct. 2063. Not only must the plaintiff “be an active, voluntary participant in the unlawful activity that is the subject of the suit,” but it is necessary that “the degrees of fault [be] essentially indistinguishable or the plaintiffs responsibility [be] clearly greater.” Id. at 636, 108 S.Ct. 2063. “The second prong ... embodies the doctrine’s traditional requirement that public policy implications be carefully considered before the defense is allowed,” thus “ensuring] that ... judge-made law does not undermine ... congressional policy.” Id. at 633, 108 S.Ct. 2063.
Applying its two-part test in the context of claims for violations of federal securities laws, the Supreme Court in Bateman Eichler affirmed the rejection of an in pari delicto defense against plaintiff investors who claimed that a broker-dealer gave them false and misleading information that was represented to be accurate inside information. It concluded that an investor who engaged in trading on the basis of an insider tip is not necessarily as blameworthy as a corporate insider or broker-dealer who discloses the information for personal gain. See 472 U.S. at 312-14, 105 S.Ct. 2622. In Pinter, considering claims between sellers of unregistered securities, the Court remanded for a determination of relative fault. See 486 U.S. at 63ÍM1,108 S.Ct. 2063. Comparison of the parties’ degree of fault, and thus the applicability of the first prong of the Bateman Eichler test, will often depend on findings of fact as to the circumstances of a plaintiffs involvement. See, e.g., id.; Gatt Communications, Inc. v. PMC Associates, LLC, 711 F.3d 68, 80-81 (2d Cir.2013) (noting that “several of our sister circuits [that] have recognized an in pari delicto defense in civil antitrust litigation ... have generally done so on appeal from summary judgment or after trial, when the extent and circumstances of the culpable plaintiffs involvement have been factually developed, and the possibility that the plaintiffs behavior was motivated by economic duress — a factor that could relieve the plaintiff of an in pari delicto bar — has been examined”). But a court may “appl[y] the in pari delicto doctrine at the pleadings stage.... where ... the outcome is plain on the face of the pleadings.” In re Bernard L. Madoff Investment Securities LLC, 721 F.3d 54, 65 (2d Cir.2013), cert. denied, — U.S. —, 134 S.Ct. 2895, — L.Ed.2d — (2014).
Neither the Supreme Court nor this Court has decided whether in pari delicto is a valid defense to a civil RICO claim. The courts of appeals that have reached this question have concluded that it is. See Official Committee of Unsecured Creditors of PSA Inc. v. Edwards, 437 F.3d 1145, 1152-56 (11th Cir.) (“Edwards”), cert. denied, 549 U.S. 811, 127 S.Ct. 45, 166 L.Ed.2d 19 (2006); Rogers v. *163 McDorman, 521 F.3d 381, 387-91 (5th Cir.2008).
RICO itself, while expressly authorizing a person injured in its business or property to bring a civil action for treble damages, see 18 U.S.C. § 1964(c), is silent as to the availability of any common-law defense. Such silence does not necessarily mean that such defenses are unavailable, however, because “Congress is understood to legislate against a background of common-law adjudicatory principles.” Astoria Federal Savings & Loan Ass’n v. Solimino, 501 U.S. 104, 108, 111 S.Ct. 2166, 115 L.Ed.2d 96 (1991). “Thus, where a common-law principle is well established, ... the courts may take it as given that .Congress has legislated with an expectation that the principle will apply except when a statutory purpose to the contrary is evident.” Id. (internal quotation marks omitted).
The in pari delicto principle is well established. The Bateman Eichler Court traced the “classic formulation” of the doctrine back to the eighteenth century. 472 U.S. at 306-07 & n. 12, 105 S.Ct. 2622; see, e.g., Nisselson v. Lernout, 469 F.3d 143, 151 (1st Cir.2006) (in pan delicto “has long been woven into the fabric of federal law”), cert. denied, 550 U.S. 918, 127 S.Ct. 2131, 167 L.Ed.2d 863 (2007). The Pinter Court noted that the in pari delicto defense “traditionally has been applied in any action based on conduct that transgresses statutory prohibitions,” 486 U.S. at 634, 108 S.Ct. 2063 (internal quotation marks omitted), and stated that it will be “available when Congress expressly provides for private remedies,” id. at 635, 108 S.Ct. 2063, so long as application of the defense would not frustrate the purpose of the federal statute in question, see id. at 633, 637-38, 108 S.Ct. 2063.
Applying the Bateman Eichler test to the Republic’s RICO claims in the present action, we have no difficulty concluding that the district court’s dismissal on the basis of in pari delicto was correct.
1. Prong One: Responsibility
The very premise of the Republic’s Complaint is that the Hussein Regime “designed and instigated” the corruption of the Oil-for-Food Programme. (Amended Complaint ¶4.) The Complaint is replete with descriptions of demands made on the Oil Purchasing Defendants and the Vendor Defendants to pay all manner of “mandatory kickback[s]” (id. ¶ 566 (internal quotation marks omitted)) and illicit surcharges. (See Part I.C. above.) Even a defendant who had close personal ties to the Hussein Regime was forced against his will to pay illegal kickbacks in order to do business with Iraq in the Oil-for-Food Programme. (See Amended Complaint ¶¶ 352, 499-503.) Under the Hussein Regime’s policy, “[n]o company [was to] be exempted for any reason.” (Id. ¶ 502 (internal quotation marks omitted).) The Complaint portrays BNP as having concealed from the United Nations information about contract irregularities and having facilitated improper payments of escrowed funds, thereby assisting the Hussein Regime to achieve its “corrupt and wrongful intentions” (id. ¶ 980; see, e.g., id. ¶¶ 1022-1024, 1038). Because it is evident from the face of the Complaint that the Hussein Regime was the instigator and dominant force behind the scheme to subvert the Programme, the conclusion is inescapable that the Hussein Regime bears at least substantially equal responsibility for the Programme’s corruption.
The Republic attempts to escape the ramifications of this responsibility through an argument that the Regime’s wrongdoing should not be attributed to the Republic. That argument is meritless. Our law has long recognized that the legal *164 position of a foreign state survives changes in its government. Thus, a foreign state’s proprietary rights, and its causes of action in our courts, persist following a change in its form of government. See The Sapphire, 78 U.S. (11 Wall.) 164, 168, 20 L.Ed. 127 (1871); Lehigh Valley R. Co. v. State of Russia, 21 F.2d 396, 399-401 (2d Cir.), cert. denied, 275 U.S. 571, 48 S.Ct. 159, 72 L.Ed. 432 (1927). Similarly, the obligations of a foreign state are unimpaired by a change in that state’s government. See Comanche County v. Lewis, 133 U.S. 198, 205, 10 S.Ct. 286, 33 L.Ed. 604 (1890). Because “the rights of a sovereign state are vested in the state rather than in any particular government which may purport to represent it,” Guaranty Trust Co. v. United States, 304 U.S. 126, 137, 58 S.Ct. 785, 82 L.Ed. 1224 (1938) (“Guaranty Trust ”), when a foreign “government changes, the nation remains, with rights and obligations unimpaired,” United States ex rel. Kessler v. Watkins, 163 F.2d 140, 143 (2d Cir.) (internal quotation marks omitted), cert. denied, 332 U.S. 838, 68 S.Ct. 220, 92 L.Ed. 410 (1947).
The Republic’s own allegations demonstrate that, during the times relevant to the Complaint, Saddam Hussein’s regime constituted the government of Iraq. The Complaint alleged that Hussein and his political party “controlled Iraq” from the time of a 1979 “military coup” until the regime was “ousted” in 2003. (Amended Complaint ¶¶7, 216, 219.) During his years of power, Hussein — whose title was President — “installed officials under his direct control in all areas of the government” (id. ¶ 218), whom he used to control “all Iraqi ministries and agencies” (id. ¶ 562; see id. ¶ 302). As described in the Complaint, these included the ministries of oil (see id. ¶¶ 412, 490, 575, 742, 747), transportation (see id. ¶ 527), finance (see id. ¶ 569), and defense (see id. ¶¶ 569, 656). The Hussein Regime also controlled the State Oil Marketing Organization (see, e.g., id. ¶ 323), which was integral to the scheme to corrupt the Programme, and various state-owned enterprises that purchased goods from the Vendor Defendants (see id. ¶ 329). The Hussein Regime acted as the “Government of Iraq” (id. ¶ 490), as the United Nations and the United States acknowledged, and as was universally understood. As the Republic acknowledged before the district court, the Hussein Regime was “the president of Iraq [and] the government of Iraq.” 920 F.Supp.2d at 535 (internal quotation marks omitted).
The Republic insists that although the Hussein Regime “was in de facto control of the nation, it was not a de jure or legitimate government.” (Amended Complaint ¶ 220.) It alleged that the Hussein Regime assumed and retained power in contravention of domestic laws, and committed vile and genocidal acts, thereby making the Regime “[il]legitimate” from domestic and international perspectives (id. ¶¶ 220, 223). These allegations, however, are irrelevant to the question of whether the acts of the Hussein Regime were acts of Iraq. A foreign government’s actions are attributed to the state regardless of whether they are “legal under the municipal law of the foreign state,” Banco de Espana v. Federal Reserve Bank of New York, 114 F.2d 438, 443 (2d Cir.1940); see, e.g., Bernstein v. Van Heyghen Freres Societe Anonyme, 163 F.2d 246, 248-49 (2d Cir.), cert. denied, 332 U.S. 772, 68 S.Ct. 88, 92 L.Ed. 357 (1947); Westfield v. Federal Republic of Germany, 633 F.3d 409, 418 (6th Cir.2011), and whether they “are done by the authority of a de jure or titular, or of a de facto, government,” Underhill v. Hernandez, 65 F. 577, 582 (2d Cir.1895), aff'd, 168 U.S. 250, 18 S.Ct. 83, 42 L.Ed. 456 (1897). Thus, the district court properly ruled that the actions of the Hussein Regime, while it acted as the gov *165 ernment of Iraq, are to be attributed to The Republic of Iraq.
Of course, not every action that happens to be taken by officials of a foreign state is properly attributable to that state. For instance, in considering the applicability of the act-of-state doctrine— the affirmative defense that “precludes the courts of this country from inquiring into the validity of the public acts a recognized foreign sovereign power committed within its own territory,” Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398, 401, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964) (“Sabbatino”)—courts distinguish “between public and private acts of a foreign official,” Republic of the Philippines v. Marcos, 806 F.2d 344, 359 (2d Cir.1986) (“Marcos”), cert, denied, 481 U.S. 1048, 107 S.Ct. 2178, 95 L.Ed.2d 835 (1987); see, e.g., Jimenez v. Aristeguieta, 311 F.2d 547, 557-58 (5th Cir.1962), cert, denied, 373 U.S. 914, 83 S.Ct. 1302, 10 L.Ed.2d 415 (1963).
But this distinction, although useful in determining whether a foreign official’s conduct is attributable to his government or sovereign state, is beside the point where the alleged acts are those not of an individual governmental official, but instead acts coordinated pursuant to the policies of an entire government. It is apparent from the Complaint that the Hussein Regime’s effort to subvert the Programme was the policy of the Iraqi government. The Republic alleged that “the fundamental goal of the Hussein Regime [was] to maintain and extend its power.” (Amended Complaint ¶ 299.) “From the perspective of the Hussein Regime, the main goal of the conspiracy was to undermine UN sanctions” and thus to obtain foreign currency that would allow the Regime to “remain!] in power.” (Id. ¶7; see also id. ¶ 362 (referring to Hussein Regime goal of “generating] ... illicit income ..., which the Regime could use for non-humanitarian purposes”).) As the district court aptly concluded, “[t]he Complaint allege[d] a public goal, undertaken with public resources, pursued for political purposes, and using means available only to state actors.” 920 F.Supp.2d at 539. We agree, and thus conclude that the actions of the Hussein Regime are attributable to The Republic of Iraq.
We are not persuaded by the Republic’s argument that, under general principles of agency law, a government’s actions should not be attributed to the state it governs when the government abuses its power to contravene the national interest. As a preliminary matter, we note that the question of whether to attribute the conduct of a foreign government and its officials to their state is a matter of federal law because “all questions relating to an act of state are questions of federal law,” Republic of Iraq v. First National City Bank, 353 F.2d 47, 51 (2d Cir.1965) (“First National ”), cert, denied, 382 U.S. 1027, 86 S.Ct. 648, 15 L.Ed.2d 540 (1966). The parties here, who are in agreement that this issue is a matter of federal law, have not identified material differences between state and federal law, and we are not aware of any.
General principles of agency law, such as those upon which the Republic relies, are relevant to the question of whether the conduct of an official should be attributed to the state he represents. See First Fidelity Bank, N.A. v. Government of Antigua & Barbuda—Permanent Mission, 877 F.2d 189, 193 (2d Cir.1989). However, we are not aware of any cases in which agency principles of attribution were deemed relevant to the relationship between a government and its state. The Republic relies on the case of The Sapphire, which incidentally used the word “agent” while holding that a successor government stands in the legal shoes of its *166 predecessor, see 78 U.S. (11 Wall.) at 168-69. But that case does not stand for the proposition that a government is to be treated as a separate entity that is an agent of its state. Nor should it be, because a government and the sovereign state it rules do not have separate legal personalities. See Guaranty Trust, 304 U.S. at 137, 58 S.Ct. 785 (“the rights of a sovereign state are vested in the state rather than in any particular government which may purport to represent it”).
Even assuming that Iraq could be regarded as a principal and the Hussein Regime its agent, under the general rule of agency the agent’s actions are normally attributed to the principal. To escape application of this general rule, the Republic seeks to invoke what is known as the “ ‘adverse interest’ exception,” under which “acts of the agent will not be charged to the [principal] if although the agent purportedly acts for the [principal], he is really committing a fraud for his own benefit,” In re Bennett Funding Group, Inc., 336 F.3d 94, 100 (2d Cir.2003) (internal quotation marks omitted). However, “this [is the] most narrow of exceptions,” “reserve[d] ... for those cases — outright theft or looting or embezzlement — where the insider’s misconduct benefits only himself or a third party; i.e., where the fraud is committed against a [principal] rather than on its behalf.” Kirschner v. KPMG LLP, 15 N.Y.3d 446, 466-67, 912 N.Y.S.2d 508, 519, 938 N.E.2d 941 (2010) (“Kirschner ”) (emphasis in original).
“To come within the exception, the agent must have totally abandoned his principal’s interests and be acting entirely for his own or another’s purposes. It cannot be invoked merely because he has a conflict of interest or because he is not acting primarily for his principal”....
Id. at 466, 912 N.Y.S.2d at 519, 938 N.E.2d 941 (quoting Center v. Hampton Affiliates, Inc., 66 N.Y.2d 782, 784-85, 497 N.Y.S.2d 898, 900, 488 N.E.2d 828 (1985)) (emphases in Kirschner). “Thus, [s]hould the agent act[] both for himself and for the principal, ... application of the exception would be precluded....” Kirschner, 15 N.Y.3d at 467, 912 N.Y.S.2d at 519, 938 N.E.2d 941 (internal quotation marks omitted). “This rule avoids ambiguity where there is a benefit to both the [agent] and the [principal], ...” Id. at 466, 912 N.Y.S.2d at 519, 938 N.E.2d 941 (internal quotation marks omitted).
The adverse-interest exception is inapplicable to the Republic in light of the Complaint’s allegations of Hussein Regime conduct that, rather than totally abandoning Iraq’s interests, in part benefited Iraq. The Complaint alleged, for example, that millions of dollars of secret illegal surcharges were paid “to the Government of Iraq” (Amended Complaint ¶ 483 (internal quotation marks omitted)) to enable “the Government of Iraq to achieve its objective of collecting the illegal surcharges on oil” (id. ¶ 482 (internal quotation marks omitted)). The Complaint also alleged that the Vice President of the Hussein Regime had ordered that all of the sham after-sales-service fees — which totaled “about $1.02 billion ... by March 2003” (id. ¶ 620)— “ ‘be transferred to general treasury ’ ” (id. ¶ 568 (emphasis added)). Thus, even if Iraq were regarded as a principal and the Hussein Regime its agent, the adverse-interest rule would be inapplicable because some of the misconduct was committed on behalf of Iraq.
The Republic argues that in order to “support application of the adverse interest exception,” it should have been allowed to amend the Amended Complaint to clarify and amplify allegations that “Hussein utilized his control over the Iraqi government to serve his personal goals.” (Republic brief on appeal at 31.) *167 But even in making that argument the Republic reveals its futility. The Republic states that it would allege that “Hussein and his family stole a material portion of the funds paid illegally to the Hussein Regime by the Defendants.” (Republic brief on appeal at 35 (emphasis added).) As the Republic has alleged that the Hussein Regime ordered some of the illegally obtained funds to be deposited in Iraq’s treasury and used for political purposes, the interests of Iraq were not totally abandoned. The adverse-interest exception cannot apply to allegations that Saddam Hussein’s government and its coconspirators obtained funds by fraud on behalf of, among others, the Iraqi State.
Finally, the fact that Saddam Hussein’s government was deposed in favor of a constitutional democracy provides no basis to avoid imputing its conduct to the Republic. The change in the structure of a foreign government “works no change in the national sovereignty or its rights,” The Sapphire, 78 U.S. (11 Wall.) at 168, because those “rights ... are vested in the state rather than in any particular government which may purport to represent it,” Guaranty Trust, 304 U.S. at 137, 58 S.Ct. 785. Likewise, where a plaintiff in Iraq’s position bears fault, it does not escape the consequence of its wrongdoing on the basis of a change in leadership. Cf. Baena v. KPMG LLP, 453 F.3d 1, 9-10 (1st Cir.2006) (doubting an exception to in pari delicto for cases “where prior management was at fault” even where “the claim [is] asserted on behalf of [innocent] creditors or shareholders”).
In sum, the Complaint reveals that the government of Iraq was the instigator and dominant party in the frauds and breaches that corrupted the Oil-for-Food Pro-gramme. Its responsibility for the wrongs perpetrated was at least as great as that of any defendant. The district court properly attributed that responsibility to the Republic.
2. Prong Two: Policy
The second prong of the Bate-man Eichler test asks whether recognition of the in pari delicto defense to a federal statutory cause of action would comport with the purposes of the statute. The Eleventh Circuit has aptly explained why “the application of in pari delicto to bar [a coconspirator’s RICO claim] advances the policy of civil liability under the federal RICO statute,” Edwards, 437 F.3d at 1155:
Under RICO, “[i]t shall be unlawful for any person employed by or associated with any enterprise ... to conduct or participate ... in the conduct of such enterprise’s affairs through a pattern of racketeering activity or collection of unlawful debt.” 18 U.S.C. § 1962(c) (emphases added). It would be anomalous, to say the least, for the RICO statute to make racketeering unlawful in one provision, yet award the violator with treble damages in another provision of the same statute. Congress intended RICO’s civil remedies to help eradicate organized crime from the social fabric by divesting the association of the fruits of ill-gotten gains.... [Plaintiffj’s recovery under RICO would not divest RICO violators of their ill-gotten gains; it would result in a wealth transfer among similarly situated conspirators.
437 F.3d at 1155 (other internal quotation marks omitted). We agree. Thus, it is consistent with the purpose of RICO to recognize an in pari delicto defense in cases where, as a direct result of the plaintiffs “affirmative wrongdoing,” id., the plaintiff bears “at least substantially equal responsibility,” Bateman Eichler, 472 U.S. *168 at 310, 105 S.Ct. 2622, for the RICO violations of which it complains.
We see no error in the district court’s ruling that application of the in pari delicto doctrine in the present case does not offend public policy. We conclude that the Republic’s RICO claims were properly dismissed on the basis of that doctrine.
3. A New Words About the Dissent
Our dissenting colleague’s disagreement with our affirmance of the district court’s dismissal of the Republic’s RICO claims on the basis of the in pari delicto defense prompts us to make several observations as to the dissent’s analysis of that defense and of the effect of its application.
a. The Dissent’s Interpretation of Bateman Eichler
The dissent appears to accept that, in determining whether “the in pari delicto defense is allowed,” we should look to the two-pronged test set out in Bateman Eichler, Dissenting Opinion post at 178-79. However, we disagree with the dissent’s interpretation of each prong of that test.
As to the first prong, we do not agree that the in pari delicto defense — as contrasted with the doctrine of unclean hands — is “founded ‘upon the court’s repugnance to the suitor personally,’ ” id. at 180 (quoting Art Metal Works, Inc. v. Abraham & Straus, Inc., 70 F.2d 641, 646 (2d Cir.1934) (“Art Metal Works I”) (L. Hand, J., dissenting), on reconsideration, dissent adopted by Art Metal Works, Inc. v. Abraham & Straus, Inc., 107 F.2d 944 (2d Cir.) (“Art Metal Works II”), cert. denied, 308 U.S. 621, 60 S.Ct. 293, 84 L.Ed. 518 (1939) (collectively “Art Metal Works ”)), or with our dissenting colleague’s view that “in pari delicto ‘has nothing do with the rights or liabilities of the parties,’” Dissenting Opinion post at 179 (quoting Art Metal Works I, 70 F.2d at 646 (L. Hand, J., dissenting)). Art Metal Works I was decided on the basis of the doctrine of unclean hands. See 70 F.2d at 644 (majority opinion) (“[a]pplying th[e] principle of equity” that “one coming into a court of equity must do so with clean hands”); id. at 646 (L.Hand, dissenting) (“The doctrine is confessedly derived from the unwillingness of a court, originally and still nominally one of conscience, to give its peculiar relief to a suitor who in the very controversy has so conducted himself as to shock the moral sensibilities of the judge.”).
Although the doctrines of unclean hands and in pari delicto are often mentioned in the same breath, they are “distinct terms for ... distinct situations,” Perma Life, 392 U.S. at 153 n.1, 88 S.Ct. 1981 (Harlan, J., concurring in part and dissenting in part). Only the former was at issue in Art Metal Works, and only the latter is at issue here. The in pari delicto doctrine was not mentioned in any of the Art Metal Works opinions, and indeed could not have had application in that case. As the Supreme Court has described the Bateman Eichler test, the in pari delicto doctrine does not depend upon the plaintiffs morality, but instead permits the “defendant [to] escape liability” to the plaintiff based on the plaintiffs “at least substantially equal responsibility for the underlying illegality,” Pinter, 486 U.S. at 635-36, 108 S.Ct. 2063 (emphasis added); see id. at 636, 108 S.Ct. 2063 (“Plaintiffs who are truly in pari delicto are those who have themselves violated the law in cooperation with the defendant.” (internal quotation marks omitted) (emphasis ours)). In Art Metal Works, a case involving patent infringement, there was no suggestion that the plaintiff shared any responsibility for the defendant’s infringement.
*169 We agree, of course, that the in pari delicto “doetrine[ ] require[s] that the plaintiff be ... ‘an active, voluntary participant in the unlawful activity that is subject of the suit,’ ” Dissenting Opinion post at 180 (quoting Pinter, 486 U.S. at 636,108 S.Ct. 2063). But we are aware of no authority in federal law requiring such responsibility to be “personal[ ]” rather than “derivative,” Dissenting Opinion post at 180 (internal quotation marks omitted), especially in the context of a government’s action, given the principle, discussed above, that the rights and liabilities of a sovereign state are unaltered by the upheaval of its government.
We also disagree with the dissent’s interpretation of the second prong of the Bateman Eichler test. The dissent focuses on the United States policy interest in providing humanitarian aid to the people of Iraq. However, the appropriate focus for a court considering the applicability of the in pari delicto defense to a federal cause of action is the public policy that underlies the particular statute that provides that cause of action. See, e.g., Pinter, 486 U.S. at 638, 108 S.Ct. 2063 (considering “the underlying statutory policies ____of the Securities Act”); Bateman Eichler, 472 U.S. at 315, 105 S.Ct. 2622 (considering “the primary objective of the federal securities laws”); Edwards, 437 F.3d at 1155 (considering “the policy of civil liability under the federal RICO statute”). The dissent’s approach would free courts to disregard the in pari delicto defense on the basis of any “policy” articulable by a creative plaintiff.
b. Additional Observations
We are compelled to make three additional observations as to views expressed by the dissent as to the effect of our decision. First, the view that our decision “deprive[s] the ultimate victims of the defendants’ conduct of any remedy,” Dissenting Opinion post at 174 (emphasis added), appears to focus on the Republic’s original attempt to pursue this action in parens patriae. The district court ruled that the Republic “does not have parens patriae standing, [and] it may not pursue claims in this action for harms to its quasi-sovereign interests or general harm inflicted on the people of Iraq,” 920 F.Supp.2d at 533 (emphases added). The Republic has not challenged this ruling on appeal.
Second, the dissent appears to endorse the view of the Republic “that it was the victim of a fraud,” Dissenting Opinion post at 183 (emphasis added). However, as the Amended Complaint reveals, the government of Iraq was not the fraud’s victim but its perpetrator and enforcer.
Finally, we reject the dissent’s notion that our decision “release[s]” and “immunized the defendants from liability for conduct that was illegal under U.S. law,” Dissenting Opinion post at 174, 183. Plainly, our conclusion—that RICO’s treble damages provision is not meant to enrich the entity that instigated and coordinated the illegal scheme—does not preclude either more appropriate civil lawsuits or the criminal prosecution of lawbreakers.
B. The Foreign Corrupt Practices Act
The Amended Complaint alleged that the surcharges and kickbacks paid by the Vendor and Oil Purchasing Defendants violated the antibribery provisions of the FCPA. The Republic contends that the district court should have recognized an implied private right of action for violations of those provisions despite a consistent line of cases holding to the contrary. The Republic is particularly critical of Lamb v. Phillip Morris, Inc., 915 F.2d 1024 (6th Cir.1990) {“Lamb”), cert, denied, 498 U.S. 1086, 111 S.Ct. *170 961, 112 L.Ed.2d 1048 (1991), the leading case declining to recognize such a cause of action. The Republic argues that Lamb erred in its analysis of the legislative history of the FCPA and that that history suggests that the reason Congress did not expressly provide for a private right of action was to avoid creating a “negative inference” (Republic brief on appeal at 58 (internal quotation marks omitted)), that would dissuade judicial recognition of implied private rights of action under other provisions of the Securities Exchange Act of 1934, to which the FCPA was an amendment. We are unpersuaded.
“[P]rivate rights of action to enforce federal law must be created by Congress.” Alexander v. Sandoval, 532 U.S. 275, 286, 121 S.Ct. 1511, 149 L.Ed.2d 517 (2001) (“Sandoval”). A federal statute may create a private right of action either expressly or, more rarely, by implication. In considering whether a statute confers an implied private right of action, “[t]he judicial task is to interpret the statute Congress has passed to determine whether it displays an intent to create not just a private right but also a private remedy.” Id. To discern Congress’s intent, “we look first to the text and structure of the statute.” Lindsay v. Association of Professional Flight Attendants, 581 F.3d 47, 52 (2d Cir.2009), cert. denied, 561 U.S. 1038, 130 S.Ct. 3513, 177 L.Ed.2d 1114 (2010). To “illuminate” this analysis, id. at 52 n.3, we also consider factors enumerated in Cort v. Ash, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), which include the following:
First, is the plaintiff one of the class for whose especial benefit the statute was enacted, ... — that is, does the statute create a federal right in favor of the plaintiff? Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one?.... Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff?
Id. at 78, 95 S.Ct. 2080 (emphasis in Cort v. Ash) (internal quotation marks omitted). In our analysis, we are mindful that “the Supreme Court has come to view the implication of private remedies in regulatory statutes with increasing disfavor.” Hallwood Realty Partners, L.P. v. Gotham Partners, L.P., 286 F.3d 613, 618 (2d Cir.2002).
The antibribery provisions of the FCPA prohibit certain entities and persons from, inter alia, corruptly making payments to foreign officials for the purpose of influencing official action in order to obtain business. See 15 U.S.C. §§ 78dd-l(a), 78dd-2(a), 78dd-3(a). The text of the statute contains no explicit provision for a private right of action, although it does provide for civil and criminal penalties, see id. §§ 78dd-2(g), 78dd-3(e), 78ff(e), and permits the Attorney General to seek injunctive relief, see id. §§ 78dd-2(d), 78dd-3(d). Because “[t]he express provision of one method of enforcing a substantive rule suggests that Congress intended to preclude others,” Sandoval, 532 U.S. at 290, 121 S.Ct. 1511, the structure of the statute, by focusing on public enforcement, tends to indicate the absence of a private remedy-
The Cort v. Ash factors also do not support recognition of a private right. The statute’s prohibitions focus on the regulated entities; the FCPA contains no language expressing solicitude for those who might be victimized by acts of bribery, or for any particular class of persons. “Statutes that focus on the person regulated rather than the individuals protected create no implication of an intent to confer rights on a particular class of persons.” *171 Sandoval, 582 U.S. at 289, 121 S.Ct. 1511 (internal quotation marks omitted).
Nor does the legislative history of the FCPA demonstrate an intention on the part of Congress to create a private right of action. As discussed in Lamb, 915 F.2d at 1029, a bill introduced by Senator Church in the 94th Congress included an express right of action for competitors of those who bribed foreign officials, see S. 3879, 94th Cong. § 10, 122 Cong. Rec. 12,605, 12,607 (1976); that provision, however, was deleted by a committee of the Senate, see S.Rep. No. 94-1031, at 13 (1976).
In the 95th Congress, which finally enacted the FCPA, a committee of the House of Representatives, in reporting out a bill that did not provide expressly for a private right of action, made a statement that the House “Committee intends that the courts shall recognize a private cause of action based on this legislation ... on behalf of persons who suffer injury as a result of prohibited corporate bribery,” H.R.Rep. No. 95-640, at 10 (1977). We have three main problems with the Republic’s reliance on this statement, and other aspects of the FCPA’s legislative history, as justification for judicial implication of a private right of action in its favor.
First, the House committee’s statement was not repeated (and no endorsement of its substance was in any way suggested) in the reports of either the Senate committee considering the FCPA or the conference committee that reconciled the views of the House and Senate to produce the language of the FCPA as it was ultimately enacted. See S.Rep. No. 95-114 (1977); H.R. Rep. 95-831 (1977). Indeed, in the debate on the conference committee report, one conferee stated that the question of whether “courts will recognize [an] implied private right of action .... was not considered in the Senate or during the conference, and thus [it] cannot be said that any intent is expressed at all on this issue.” 123 Cong. Rec. 38,601, 38,602 (1977) (statement of Sen. Tower) (emphasis added).
Second, although the legislative history contains additional references to the desirability of a private right of action, they do not provide any clear indication of congressional intent to create one. See generally Siegel, The Implication Doctrine and the Foreign Corrupt Practices Act, 79 Colum. L.Rev. 1085, 1105-12 (1979) (canvassing the legislative history in detail and finding “no conclusive evidence of congressional intent to grant private actions”).
Third, we note that this case illustrates the wisdom of Lamb, which avoids the question of what class of parties the FCPA was designed to protect. Although we agree that the statute was “primarily designed to protect the integrity of American foreign policy and domestic markets,” Lamb, 915 F.2d at 1029, one might argue that it is principally the foreign governments whose processes might be corrupted. The Republic’s claim highlights the obvious problem with the latter concern here: The foreign government supposedly to be “protected]” by the FCPA was the entity that demanded the bribes in the first place.
Finally, we note that although it has been nearly a quarter of a century since Lamb was decided, and although Congress has more recently amended the FCPA, see International Anti-Bribery and Fair Competition Act of 1998, Pub.L. No. 105-366, 112 Stat. 3302 (1998), Congress has not chosen to override Lamb. We conclude that there is no private right of action under the antibribery provisions of the FCPA and that the district court did not err in dismissing the Republic’s FCPA claims.
*172 C. The Common-Law Causes of Action
The nonstatutory causes of action asserted in the Amended Complaint included claims of fraud, breach of fiduciary duty, breach of contract, and unjust enrichment. The district court, having dismissed the Republic’s statutory causes of action, declined to exercise supplemental jurisdiction over these common-law claims. The Republic, citing First National, 353 F.2d 47, and Marcos, 806 F.2d 344, contends that the court should have entertained the nonstatutory claims as a matter of federal common law, in the interest of having “the nation ... speak with a united voice” in order to avoid complicating “foreign relations.” (Republic brief on appeal at 59 (internal quotation marks omitted).) The Republic’s reliance on these cases is misplaced.
“There is no federal general common law,” Erie R. Co. v. Tompkins, 304 U.S. 64, 78, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), although federal common law has been held to displace state law in a few “narrow areas” involving “uniquely federal interests,” including where the “international nature of the controversy makes it inappropriate for state law to control,” Texas Industries, Inc. v. Radcliff Materials, Inc., 451 U.S. 630, 641-42, 101 S.Ct. 2061, 68 L.Ed.2d 500 (1981) (internal quotation marks omitted). However, courts are to recognize the “judicial creation of a special federal rule” only in those rare “situations where there is a significant conflict between some federal policy or interest and the use of state law.” O’Melveny & Myers v. FDIC, 512 U.S. 79, 87, 114 S.Ct. 2048, 129 L.Ed.2d 67 (1994) (internal quotation marks omitted).
In First National, we simply applied the existing rule that the applicability of the act-of-state doctrine is a question of federal law. See 353 F.2d at 50-51. It has long been established that the question of whether to “pass[ ] on the validity of foreign acts of state” is a “uniquely federal” issue, Sabbatino, 376 U.S. at 423-24, 84 S.Ct. 923. In Marcos, we concluded that there was federal jurisdiction over a suit brought by a foreign state against its former president to “regain proper[t]y allegedly obtained as the result of acts when he was head of state”; we so held for a number of reasons, one of which was “the necessary implications of such an action for United States foreign relations.” 806 F.2d at 354. Such a consideration, quite similar to that underlying the act-of-state doctrine, is not present here.
In the present case, the Complaint’s assertion of nonstatutory wrongs describes traditional types of torts by private entities. The Republic identifies no uniquely federal interest in the rules of decision to be applied, nor any conflict between a federal policy or interest and the use of state law. We conclude that the district court correctly determined that these claims arose under state law rather than federal common law. And having dismissed the federal statutory claims “at the very beginning of the case,” Brzak v. United Nations, 597 F.3d 107, 114 (2d Cir.), cert. denied, — U.S. —, 131 S.Ct. 151, 178 L.Ed.2d 243 (2010), the district court properly declined to exercise supplemental jurisdiction over the state-law claims.
CONCLUSION
The Republic of Iraq’s allegations in this case paint a sorry portrait of a greedy and ruthless government colluding with venal individuals and business firms to divert funds intended for the benefit of a suffering population, and using those funds to cement political power while scoffing at the humanitarian concerns of the international community and the laws of the United States. The principal question here, however, has been whether United States law *173 permits the Republic, through its present government, to recover damages from its former government’s coconspirators on the basis of the actions that they took in response to that former government’s demands. Applying settled principles of state responsibility and statutory interpretation, we have concluded that it does not.
Having considered all of the Republic’s arguments on this appeal, we find in them no basis for reversal. The judgment of the district court dismissing the Amended Complaint is affirmed.
Judge DRONEY concurs in part and dissents in part, in a separate opinion.